Anne M. Collart, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
acollart@gibbonslaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| D.R.M., on his own behalf and on behalf of his minor child, J.J.R.S.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | **COMPLAINT**<br><br>Civil Action No. 25-696<br><br>*Document Electronically Filed* |

Plaintiff D.R.M., on his own behalf and on behalf of his minor child, J.J.R.S. ("Plaintiffs"), by their attorneys, hereby file this Complaint against Defendant United States of America. Plaintiffs allege as follow:

### INTRODUCTION

1.     This case concerns an unprecedented and inhumane government policy designed to intentionally and systematically separate asylum-seeking parents from their children at the United States border.  Beginning in 2017 and continuing into 2018, the United States Government separated thousands of families.  Those separations caused significant and lasting trauma to both the impacted children and their parents, including Plaintiffs—a father and his (then) three-year-old son who were forcibly separated for seven months, during which time the child underwent heart surgery without his parents.

2.    That harm was no accident—it was the government's goal.  Federal officials at the highest levels repeatedly and publicly confirmed that the Family Separation Policy ("the Policy") was designed to inflict trauma in order to deter asylum seekers from coming to the United States.

3.    For example, then-Acting Assistant Secretary of the Department of Health and Human Services Steven Wagner told reporters: "We expect that the new [separation] policy will result in a deterrence effect, we certainly hope that parents stop bringing their kids on this dangerous journey and entering the country illegally."[1]

4.    Then-Attorney General Jeff Sessions declared: "We need to take away children . . . If [they] care about kids, don't bring them in."[2]

5.    Even after a federal judge enjoined the Policy on the basis that impacted parents were likely to succeed on their claim that the separations were unconstitutional,[3] President Donald Trump continued to promote the Policy's deterrent purpose, stating that "[i]f they feel there will be separation, they don't come," and tweeting "if you don't separate, FAR more people will come."[4]

6.    Not content to merely separate parents and their minor children, the United States Government sought to inflict further trauma on these vulnerable families by refusing to provide information on their missing family members' whereabouts and wellbeing.

---

[1]    Philip Bump, *Here Are the Administration Officials Who Have Said That Family Separation Is Meant as a Deterrent*, WASH. POST (June 19, 2018, 9:14 PM), https://www.washingtonpost.com/news/politics/wp/2018/06/19/here-are-the-administration-officials-who-have-said-that-family-separation-is-meant-as-a-deterrent.

[2]    Michael D. Shear, Katie Benner & Michael S. Schmidt, '*We Need to Take Away Children,' No Matter How Young, Justice Dept. Officials Said*, N.Y. TIMES (Oct. 28, 2021), https://www.nytimes.com/2020/10/06/us/politics/family-separation-border-immigration-jeff-sessions-rod-rosenstein.html.

[3]    *Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1142-46, 1149 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019).

[4]    David Shepardson, *Trump Says Family Separations Deter Illegal Immigration*, REUTERS (Oct. 13, 2018, 11:38 PM), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-family-separations-deter-illegal-immigration-idUSKCN1MO00C.

7.      Plaintiffs in this case fell victim to the Policy in March 2018.  On or about March 16, 2018, D.R.M. and J.J.R.S., a father and son from Honduras, arrived in the United States to seek necessary medical treatment for J.J.R.S.'s congenital heart defect.

8.      Like the thousands of families separated under the Policy, they were initially detained in inhumane conditions, without adequate food, water, space, or medical attention.

9.      Upon Plaintiffs' arrival, immigration officials discarded J.J.R.S.'s heart medication—against agency policy[5]—despite being told by D.R.M. that J.J.R.S. had a serious heart condition.

10.     A few days later, United States government officials forcibly removed J.J.R.S. from his father's arms, without notice or explanation, and thereafter separated them for approximately seven months.

11.     During this time, D.R.M. was deported to Honduras, while J.J.R.S. was sent to a foster care facility in the Bronx.  J.J.R.S. received multiple surgical procedures during the separation period without his parents by his side—some of which his parents did not even learn about until later.

12.     As a result of the forced separation, Plaintiffs experienced deep and lasting trauma. The mental, emotional, and physical harm inflicted on Plaintiffs by the United States Government is likely to stay with them for the rest of their lives.

13.     The United States is liable for those harms and should be held accountable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671.

---

[5]     *See* Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search* (2015) [hereinafter *TEDS*], *available at* https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search (last visited May 22, 2020).

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1346(b) and 2675.

15.     The FTCA provides that district courts "shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

16.     On March 12, 2020, Plaintiffs submitted administrative claims to the United States Department of Homeland Security ("DHS"), United States Customs and Border Protection ("CBP"), United States Citizenship and Immigration Services ("USCIS"), United States Immigration and Customs Enforcement ("ICE"), and United States Department of Health and Human Services ("HHS").

17.     Plaintiffs have exhausted their FTCA claims.  Plaintiffs timely filed all required administrative forms with each of the relevant agencies of the United States of America more than six months ago.  There has been no final disposition of their administrative claims, and Plaintiffs now exercise the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

18.     Venue is proper in this District under 28 U.S.C. § 1402(b), because, among other things, Defendant is subject to personal jurisdiction in this District and Plaintiffs reside in this District.

## THE PARTIES

19.     Plaintiff J.J.R.S. is a ten-year-old Honduran boy who currently resides in Dunellen, New Jersey.  At the time of the events described herein, he was only three years old.

20.     J.J.R.S. suffers from Noonan Syndrome, associated with mutation of the RIT1 gene, one of the symptoms of which is congenital heart disease.  His condition requires constant medical attention.  Left untreated, J.J.R.S.'s condition could lead to heart failure or death.

21.     Plaintiff D.R.M. is the father of J.J.R.S. and currently resides in Dunellen, New Jersey.  D.R.M. brings this action on his own behalf and, independently, on behalf of his son.

22.     Defendant United States of America is the appropriate defendant under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2679(a).

23.     All federal officers and officials referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with federal agencies, including, but not limited to, DHS, CBP, ICE, and HHS.

## FACTUAL ALLEGATIONS

### I.    FAMILY SEPARATION POLICY

#### A.    The Government Begins Planning and Testing a Family Separation Policy with Deliberate Intent to Cause Harm.

24.     A hallmark policy of the Trump Administration was its relentless effort to reduce the number of individuals seeking refuge in the United States.

25.     Consistent with that mission, only weeks after inauguration day in 2017, John Lafferty, then-Chief of the Asylum Division at USCIS, held an inter-governmental town hall meeting where he described a new potential policy designed to deter asylum-seekers from migrating to the United States with their children.

26.    The centerpiece of this new policy was separating parents from their children upon arrival at the southern border to intimidate or stop others from exercising their legal right to seek asylum in the United States.[6]

27.    On March 6, 2017, then-DHS Secretary John Kelly confirmed that the Administration was considering family separation as an immigration deterrent.[7]  That policy would be a radical break from longstanding federal border policy, which prioritized keeping arriving families together.[8]

28.    On April 11, 2017, then-Attorney General Jeff Sessions issued a memorandum asking federal prosecutors to prioritize criminal enforcement of immigration-related offenses.[9] Specifically, the April 2017 Sessions memo prioritized the enforcement of particular immigration-related offenses, including violations of 8 U.S.C. § 1324 ("[b]ringing in and harboring certain aliens") and 8 U.S.C. § 1325 ("[i]mproper entry by alien").  The Attorney General wrote that prosecution of immigration-related offenses "will further reduce illegality."

29.    In June 2017, ICE terminated the Family Case Management Program, under which asylum seekers were allowed to remain in the community during the pendency of their proceedings

---

[6]    Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, Reuters (Mar. 3, 2017, 8:32 PM), https://www.reuters.com/ article/us-usa-immigration-children/ exclusive-trump-administration-considering-separating-women-children-at-mexico-border-idUSKBN16A2ES.

[7]    *Kelly: Separating Families under Consideration*, CNN (Mar. 6, 2017), https://www.cnn.com/videos/politics/ 2017/03/06/trump-travel-ban-separate-parents-children-kelly-tsr-bts.cnn.

[8]    In order to preserve family unity, DOJ had for years generally declined to "refer parents in family units who were apprehended at the border for illegal entry prosecution if the referral would result in children being separated from their parents."  *See* U.S. Dep't of Just., Off. of Inspector Gen., *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 14 (2021) [hereinafter *DOJ OIG Planning Report*], https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.  Similarly, DHS had a longstanding policy of keeping arriving immigrant families intact as their immigration cases were handled by immigration officials. *Id.* at 9 ("At the time, DHS was pursuing such family unit adult cases administratively rather than criminally, consistent with its longstanding policy related to concerns about separating children from parents.").

[9]    Attorney General Jefferson Beauregard Sessions III, Memorandum, *Renewed Commitment to Criminal Immigration Enforcement* (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

while receiving case management services such as legal and social services.  Terminating this program signaled a coordinated policy of subjecting asylum seekers to prolonged detention.

30.    The first known widespread implementation of the Family Separation Policy stemming from the April 2017 Sessions memo was in CBP's El Paso sector.  Beginning in July 2017, the El Paso sector implemented new policies that resulted in approximately 280 individuals in families being separated.[10]

31.    Under these policies, the government prioritized the aggressive prosecution of misdemeanor charges of improper entry under 8 U.S.C. § 1325, including the prosecution of parents who crossed the border into the United States with young children.  When a child and parent were apprehended together by immigration authorities, CBP would detain the parent for prosecution and forcibly take away the child.

32.    After the *government* had separated the children from their parents, it then erroneously designated the children as "unaccompanied minors" and placed them in the custody of HHS's Office of Refugee Resettlement ("ORR").[11]  ORR was not informed of the pilot program or that the children being sent to its custody had, in fact, arrived with parents but were separated from them.[12]  Nor did the government keep track of the families it had separated.  As a result, parents and children were detained without being in communication with one another and with no

---

[10]    U.S. Dep't of Justice, Off. of Inspector Gen., *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Departments of Homeland Security and Health and Human Services* 9-10 (2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf.

[11]    U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., OEI-BL-18-00511, *Separated Children Placed in Office of Refugee Resettlement Care* 3 (2019), https://oig.hhs.gov/oei/reports/oei-BL-18-00511.pdf.

[12]    Comm. on the Judiciary, U.S. House of Representatives, *The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos, Majority Staff Report* 9 (2020) [hereinafter *House Report*] ("Despite the impact on the agency, ORR was not informed of the ongoing pilot program for at least three months after its initiation.") https://democrats-judiciary.house.gov/uploadedfiles/the_trump_administration_family_separation_policy_trauma_destruction_and_chaos.pdf?utm_campaign=4526-519.

information about one another's location or wellbeing. These circumstances were not an accidental effect of the Policy; they were its intended purpose.

33. On December 11, 2017, eight organizations sent a letter to the DHS Office for Civil Rights and Civil Liberties and the DHS Acting Inspector General, urging an investigation into DHS's separation of family members in CBP custody at the U.S.-Mexico border and a stop to the "practice of separating families for purposes of punishment and deterrence."[13] The letter emphasized "the immense trauma created by the separation of family members and the impact of separation on their ability to pursue legal immigration relief."[14] The letter also raised concerns about the government's refusal to track or provide contact information for separated family members.[15]

34. The government, however, continued to push forward. In December 2017, senior officials at the Department of Justice ("DOJ") and DHS exchanged a memorandum titled "Policy Options to Respond to Border Surge of Illegal Immigration."[16]

35. Two of the policies outlined in the memorandum were titled: "Increased Prosecution of Family Unit Parents" and "Separate Family Units." Under the proposed prosecution policy, "parents would be prosecuted for illegal entry . . . and the minors present with

---

[13] Letter from Eight Non-Profit Organizations to Cameron Quinn, DHS Officer for Civil Rights and Liberties, and John Kelly, DHS Acting Inspector General, Women's Refugee Commission 2 (Dec. 11, 2017), https://www.womensrefugeecommission.org/wp-content/uploads/2020/04/Family-Separation-Complaint-FINAL-PUBLIC-12-11-17.pdf.

[14] *Id.*

[15] *Id.*

[16] U.S. Dep't of Justice, *Policy Options to Respond to Border Surge of Illegal Immigration*, (Dec. 16, 2017), https://www.documentcloud.org/documents/5688664-Merkleydocs2.html; *see also* Julia Ainsley, *Trump Admin Weighed Targeting Migrant Families, Speeding Up Deportation of Children*, NBC NEWS (Jan. 17, 2019, 8:37 PM), https://www.nbcnews.com/politics/immigration/trump-admin-weighed-targeting- migrant-families-speeding-deportation-children-n958811 (explaining that the December 2017 policy options draft plan was made public by the office of Senator Jeff Merkley).

them would be placed in HHS custody as [unaccompanied alien children]."[17]  The memorandum asserted that "the increase in prosecutions would be reported by the media and it would have substantial deterrent effect."[18]  The policy likewise called for an announcement that adults would be placed in adult detention while children would be placed in HHS custody.

36.    Between late 2017 and early 2018, ORR staff in Texas and Arizona noted an increase in the number of children separated from their parents.[19]

37.    DHS officials interviewed by the United States Government Accountability Office ("GAO") stated that after the April 2017 Sessions memo, there was an increase in the number of noncitizens referred by CBP to DOJ for prosecution of immigration-related offenses.

38.    Parents who were criminally prosecuted were taken into the custody of the United States Marshals Service and separated from their children.

39.    On February 8, 2018, members of Congress sent a letter to DHS Secretary Nielsen expressing their concern that DHS was "intentionally" separating immigrant families along the southern border.[20]

40.    The members of Congress wrote that separating families was "unconscionable and contradicts the most basic of American family values."[21]  They took issue with the purported

---

[17]  *Id.* at 1.

[18]  *Id.*

[19]  U.S. Gov't Accountability Off., GAO-19-163, *Unaccompanied Children: Agency Efforts to Reunify Children Separated from Parents at the Border* 13 (Oct. 9, 2018), https://www.gao.gov/assets/700/694918.pdf.

[20]  Letter from Lucille Roybal-Allard, et al, U.S. Congress, to Kirstjen Nielsen, DHS Secretary, Immigration Policy Tracking Project (Feb. 8, 2018), https://immpolicytracking.org/policies/ice-and-cbp-reportedly-separating-family-members/#/tab-policy-documents.

[21]  *Id.*

justification of family separation as a deterrent to migration, stating, "the pretext of deterrence is not a legally sufficient basis for separating families."[22]

41.     They further noted that some reports of instances of family separation "appear[] to be in direct contradiction to previously articulated policies," and that "ICE, [ORR], CBP, and the [DOJ] have inadequate measures to facilitate reunification of separated family members."[23]

42.     By the time Plaintiffs arrived in the United States in March 2018, the Family Separation Policy was well underway at border crossings throughout Texas, including in Hidalgo.

**B.     The Government Announces a Full-Scale Policy of Forcibly Separating Parents from Their Minor Children with Knowing Intent to Cause Severe Emotional Harm to Deter Future Asylum Seekers from Central America.**

43.     On April 6, 2018, then-Attorney General Sessions formally announced a "Zero Tolerance Policy" that extended the pilot program to the entire southern border.[24]  Under the Zero Tolerance Policy, which came to be known as the "Family Separation Policy," DOJ mandated the criminal prosecution of *all* persons who crossed the United States border, regardless of whether they were seeking asylum or arriving with children.

44.     On May 4, 2018, at the urging of Sessions, then-DHS Secretary Kirstjen Nielsen signed the DHS policy directing CBP to refer for prosecution adults arriving in family units.

45.     As Sessions explained in a speech on May 7, 2018, "I have put in place a 'zero tolerance' policy for illegal entry on our Southwest border.  If you cross this border unlawfully,

---

[22]    *Id.*

[23]    *Id.*

[24]    U.S. Dep't of Just., Off. of Pub. Affs., *Attorney General Announces Zero Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

then we will prosecute you.  It's that simple."[25]  And if you cross the border with a child, Sessions

added, "then we will prosecute you and that child will be separated from you."[26]

46.     The Policy's logic was straightforward: inflict enough harm to discourage

migration and deter people from seeking asylum.

47.     The government pretextually justified the Family Separation Policy by

emphasizing its "legal obligation to protect the best interests of the child whether that be from

human smugglings, drug traffickers, or nefarious actors who knowingly break [U.S.] immigration

laws and put minor children at risk."[27]

48.     As Nielsen claimed in June 2018:

> DHS is not separating families legitimately seeking asylum at ports
> of entry.  If an adult enters at a port of entry and claims asylum, they
> will not face prosecution for illegal entry.  They have not committed
> a crime by coming to the port of entry . . . We will only separate the
> family if we cannot determine there is a familial relationship, if the
> child may be at risk with the parent or legal guardian, or if the parent
> or legal guardian is referred for prosecution.[28]

---

[25]    U.S. Dep't of Just., Off. of Pub. Affs., *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration* (May 7, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[26]    *Id.*

[27]    *See* Maria Sacchetti, *Top Homeland Security Officials Urge Criminal Prosecution of Parents Crossing Border with Children*, WASH. POST (Apr. 26, 2018, 7:58 PM), https://www.washingtonpost.com/local/immigration/top-homeland-security-officials-urge-criminal-prosecution-of-parents-who-cross-border-with-children/2018/04/26/a0bdcee0-4964-11e8-8b5a-3b1697adcc2a_story.html.  Other than the government's Family Separation Policy, there was no basis for separating children from their parents.  And contrary to the government's claim, "no statute or regulation mandat[ed] the separation of [families] upon their entry into the country." *C.M. v. United States*, 2020 WL 1698191, at *3 (D. Ariz. Mar. 30, 2020), *motion to certify appeal denied*, 2020 WL 5232560 (D. Ariz. July 6, 2020).  Instead, "[t]he separations were conducted pursuant to executive policy." *Nunez Euceda v. United States*, 2021 WL 4895748, at *4 (C.D. Cal. Apr. 27, 2021); *see also A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020) ("[T]he family separations were conducted pursuant to executive policy, not pursuant to any statute or regulation.").

[28]    Kirstjen Nielsen, Secretary, U.S. Dep't of Homeland Sec., White House Press Briefing (June 18, 2018), http://www.whitehouse.gov/briefings-statements/press-briefingpress-secretary-sarah?sanders-department-homeland-security-secretary-kirstjen-nielsen061818/ [https://web.archive.org/web/20180702131044/https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-department-homeland-security-secretary-kirstjen-nielsen-061818/].

49.     That statement was false.   As implemented, the Policy resulted in officials separating *all* parents from their children, even if the parents were not in fact criminally prosecuted or in criminal custody.

50.     The government designated *every* family unit adult who crossed the border between ports of entry as amenable for prosecution and separated the adults and children before any decision was made whether to actually prosecute.

51.     Because the adults were "amenable to prosecution," the government decided that they were not "available to provide care and physical custody" to their children,[29] which in turn rendered their children "unaccompanied" and subject to 8 U.S.C. § 1232(b)(3)'s custodial-transfer requirement.

52.     There was no reason that a parent who was merely "amenable" to prosecution— but had not been charged with a crime, prosecuted, or placed in criminal custody—was, for that reason alone, unavailable to care for their child.  Nor was there a valid reason why CBP continued to separate families even after the U.S. Attorney's Office declined to prosecute the parent— eliminating the only purported justification for the separation.

53.     The government was well aware of the harm that family separation would cause to parents and children.  For example:

   a.   In September 2016, the DHS Advisory Committee on Family Residential Centers
        issued a report concluding that "separation of families for purposes of immigration
        enforcement or management, or detention is never in the best interest of children."[30]
        Far from it; the report stated that: separation would have "traumatic and detrimental
        impact[s]."[31]    The Advisory Committee also cautioned that separation is
        "traumatizing and extremely stressful for the parent who is dealing with the

---

[29]    6 U.S.C § 279(g)(1) (defining "unaccompanied child").

[30]    U.S. Immigr. & Customs Enf't, Dep't of Homeland Sec., *Rep. of the DHS Advisory Committee on Family
        Residential Centers* 2 (2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-
        16093.pdf.

[31]    *Id.* at 10-11.

underlying situation but also possible feelings of guilt and worry for their child."[32] The report also stated: "[T]hreatening families with separation as means of control or retaliation breaks down the families and erodes the appropriate parent/child relationship. Families cannot thrive in settings such as these."[33]  As a result, the Advisory Committee cautioned that "[c]hildren should not be separated from their parents in order to continue to detain the adults, or to continue to hold the children by placing them in ORR care."[34]

b.  Commander Jonathan White, former Deputy Director of ORR for the Unaccompanied Alien Children's Program, testified before Congress that, starting in February 2017, he repeatedly warned those devising the Policy that separating children from their parents would likely harm the children, including giving rise to "significant potential for traumatic psychological injury to the child[.]"[35]  Other government officials issued similar warnings.[36]

c.  Officials who administered the pilot program also warned the government that separating families would cause significant harm. When ORR staff noticed a more than tenfold increase in the number of separated children entering its care in the summer of 2017, the then-Deputy Director of ORR for the Unaccompanied Alien Children's Program elevated concerns to senior ORR, HHS, CBP, and ICE officials about the traumatizing impact the separations would have on children's wellbeing.[37] No steps were taken to minimize the harm that "ORR staff warned was likely and [] ultimately did occur."[38]

---

[32]  *Id.* at 29.

[33]  *Id.* at 28-29.

[34]  *Id.* at 14.

[35]  Jeremy Stahl, *The Trump Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, SLATE (July 31, 2018, 5:05 PM), https://slate.com/news-and-politics/2018/07/the-trump-administration-was-warned-separation-would-be-horrific-for-children.html; *see also Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 116th Cong. (Feb. 7, 2019) (testimony of Commander Jonathan White), https://www.congress.gov/event/116th-congress/house-event/108846.

[36]  *See* Susan Ferriss, Ctr. for Pub. Integrity, *The Trump Administration Knew Migrant Children Would Suffer from Family Separations. The Government Ramped up the Practice Anyway*, THE TEXAS TRIBUNE (Dec. 16, 2019, 12:00 AM), https://www.texastribune.org/2019/12/16/trump-administration-knew-family-separations-harm-migrant-children/ (recounting examples of internal records warning the government about the harm family separation would cause).

[37]  *See* U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., OEI-BL-18-00510, *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy* 15-16 (2020) [hereinafter *HHS OIG Communication Report*], https://oig.hhs.gov/documents/evaluation/3206/OEI-BL-18-00510-Complete%20Report.pdf (reporting that although ORR staff "[a]t several points before the zero-tolerance policy was implemented" communicated with senior officials "that [ORR] lacked the bed capacity to accommodate a large increase in separated children and were also concerned about the trauma such a policy would inflict on children," there was "no evidence" that officials "took action to protect children's interests in response to the information and concerns raised by ORR staff").

[38]  *Id.* at 17.

54.     These reports and statements are consistent with scientific and medical evidence concluding that separating a child from their parent is extraordinarily harmful and can cause permanent emotional and behavioral problems and brain damage.[39]

55.     The government was aware of this harm and implemented the Policy precisely to induce that harm.  By publicizing the trauma suffered by these families, the Administration hoped to use the Policy to deter others from crossing the border.  Numerous high-ranking officials confirmed this goal.

a.  In early 2017, when DHS Secretary Kelly confirmed that the government was considering a family separation policy, he explained, "I would do almost anything to deter the people from Central America from getting on this very, very dangerous network that brings them up through Mexico into the United States."[40]

b.  On May 11, 2018, Kelly—who, at that point, was serving as President Trump's Chief of Staff—repeated that "a big name of the game is deterrence."  He continued that "[t]he children will be taken care of—put into foster care or whatever.  But the big point is they elected to come illegally into the United States and this is a technique that no one hopes will be used extensively or for very long."[41]

c.  On June 18, 2018, in a Fox News interview, Sessions was asked a question about whether the Policy was meant as a deterrent.  He answered: "I see the fact that no one was being prosecuted for this as a factor in a five-fold increase in four years in this kind of illegal immigration.  So yes, hopefully people will get the message and

---

[39]  *See* Allison Abrams, *Damage of Separating Families: The Psychological Effects on Children*, PSYCH. TODAY (June 22, 2018), https://www.psychologytoday.com/us/blog/nurturing-self-compassion/201806/damage-separating-families (reporting that children who are separated from a parent "develop insecure/disorganized attachment and persisting high levels of stress"); *Id.* ("[T]he effects of mother-child separation on children's aggressive behavior are early and persistent."); Olga Khazan, *Separating Kids From Their Families Can Permanently Damage Their Brains: A Pediatrician Explains How the Trauma of Family Separation Can Change Biology*, THE ATLANTIC (June 22, 2018), https://www.theatlantic.com/health/archive/2018/06/how-the-stress-of-separation-affects-immigrant-kids-brains/563468/ (noting that separating a child from their parents "can permanently affect . . . children's brains, especially if it occurs early in childhood.").

[40]  *U.S.'s Kelly Says Considering Separating Women, Children at Mexico Border*, REUTERS (Mar. 6, 2017, 6:45 PM), https://www.reuters.com/article/us-usa-immigration-children/kelly-says-considering-separating-women-children-at-mexico-border-idUSKBN16D2OX.

[41]  *Transcript: White House Chief Of Staff John Kelly's Interview With NPR*, NPR (May 11, 2018, 11:36 AM), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

come through the border at the port of entry and not break across the border unlawfully."[42]

56.    The government made the express choice to intentionally cause parents and children extraordinary pain and suffering in order to accomplish its policy objectives.

**C.    The Government Applies the Policy in a Deliberately Inhumane Manner to Cause Further Harm to Families.**

57.    Forcibly separating a child from their parent—potentially indefinitely, under coercive circumstances, without providing the parent knowledge of the child's wellbeing—is undeniably cruel.  But guided by the Policy, officers further subjected detained families to increasingly inhumane and unsafe conditions, depriving them of adequate food, adequate bedding, and sufficient space to sleep.

58.    Officers packed children and adults into metal "cages" where overhead lighting "stay[ed] on around the clock."[43]

59.    Officers initially detained many families in facilities so cold that they were referred to by asylum seekers as a "*hielera*" (or "icebox," in Spanish).  Despite the frigid temperatures in these facilities, officers often gave migrants only thin aluminum blankets.[44]

60.    Officers also often refused to give migrants clean drinking water, forcing them to drink foul-smelling and -tasting water from taps next to toilets.

---

[42]    *Sessions Defends Zero Tolerance Immigration Policy* (Fox News television broadcast June 18, 2018), https://video.foxnews.com/v/5799065216001/#sp=show-clips.25.

[43]    Nomaan Merchant, *Hundreds of Children Wait In Border Patrol Facility In Texas*, AP News (June 18, 2018, 1:34 AM), https://apnews.com/article/north-america-tx-state-wire-us-news-ap-top-news-border-patrols-9794de32d39d4c6f89fbefaea3780769.

[44]    Mariana Alfaro, *Migrants Detained at the Border are Kept In Freezing Cells Nicknamed 'Iceboxes' — Here's What We Know about Them*, Bus. Insider (Dec. 27, 2018, 2:05 PM), https://www.businessinsider.com/migrants-detained-at-border-kept-in-freezing-cells-nicknamed-iceboxes-2018-12; Human Rights Watch, *In the Freezer: Abusive Conditions for Women and Children in US Immigration Holding Cells* (2018), https://www.hrw.org/sites/default/files/report_pdf/uscrd0218_web.pdf.

61.     There were inadequate restroom facilities, and many families went days or weeks without access to clean water, showers, soap, or toothpaste.

62.     As one District Judge observed, "the government actors responsible for the 'care and custody' of migrant children have, in fact, become their persecutors."[45]

63.     Families watched as other children were taken away.  This terrified the families, who feared that their own children would be next.

64.     Immigration officials often separated children in front of their parents, forcing parents to watch as their children were led away—with no idea where their children were going, how long they would be apart, or whether they would ever be reunited.

65.     It is well-documented that the fact of separation caused physical, mental, and emotional harm to parents and children.  For example:

    a.     The HHS Office of the Inspector General acknowledged in a report that "separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated."[46]

    b.     Numerous agency officials filed reports confirming the negative effects on health, wellbeing, and safety caused by family separation, characterizing this as "abuse while in Government custody."[47]  For example, one report noted that a separated child was "tearful" and "would not speak or engage in conversation with anyone."[48]  Another described a child who "developed suicidal ideations while detained after" being separated from his family.[49]

    c.     A Physicians for Human Rights investigation based on psychological evaluations of families separated under the Policy similarly "found pervasive symptoms and

---

[45]   *Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1166 (S.D. Cal. 2018).

[46]   U.S. Dep't of Health & Human Servs., Off. of Inspector Gen., OEI-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 10 (2019) [hereinafter *HHS OIG Care Provider Report*], https://oig.hhs.gov/oei/reports/oei-09-18-00431.pdf.

[47]   Am. Immigr. Council, *Government Documents on Family Separation, Tracking the Policy's Evolution, Implementation, and Harm*, https://www.americanimmigrationcouncil.org/FOIA/government-documents-family-separation-tracking-policys-evolution-implementation-and-harm#toc-title-id-2 (last visited July 11 , 2022).

[48]   *Id.*

[49]   *Id.*

behaviors consistent with trauma; most met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder consistent with, and likely linked to, the trauma of family separation."[50]   The investigation found that trauma would also likely cause "an increased risk of psychiatric disorders such as anxiety, depression, and psychosis, and of detrimental coping behaviors such as smoking and the use of alcohol or drugs."[51]   The investigation ultimately concluded that the Family Separation Policy "constitute[d] cruel, inhuman, and degrading treatment" akin to "torture."[52]

66.     Compounding this trauma, parents and children were often not told for weeks where the other was located or when they would be reunited.

67.     These harms can and do persist even after the eventual reunification with a parent or other family.  Indeed, doctors have concluded that many of the children that the government separated from their parents will be seriously impaired for the rest of their lives.[53]

### D.     The Government Initiates a Haphazard Reunification Process after Being Ordered to End the Family Separation Policy.

68.     The public backlash against the Family Separation Policy was swift and widespread.

69.     In response, the government initially tried to backtrack and "vehemently denied" the Policy's existence.[54]

---

[50]   Physicians for Human Rights, *"You Will Never See Your Child Again," The Persistent Psychological Effects of Family Separation* 3 (2020), https://phr.org/wp-content/uploads/2020/02/PHR-Report-2020-Family-Separation-Full-Report.pdf.

[51]   *Id.* at 24.

[52]   *Id.* at 5.

[53]   *Hearing on "Examining the Failures of the Trump Administration's Inhumane Family Separation Policy" Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 116th Cong. 3 (2019) (testimony of Dr. Jack P. Shonkoff, M.D., Professor of Child Health & Dev. at the Harvard Chan Sch. of Pub. Health & the Graduate Sch. of Educ. and Professor of Pediatrics at Harvard Med. Sch.), https://www.govinfo.gov/content/pkg/CHRG-116hhrg35404/html/CHRG-116hhrg35404.htm.

[54]   *See* Christina Wilkie, *White House Denies Separating Families Is 'Policy,' but Insists It Is Needed 'to Protect Children*,' CNBC (June 18, 2018, 6:26 PM), https://www.cnbc.com/2018/06/18/white-house-denies-separating-families-is-policy.html; *see also The Way Forward on Border Security: Hearing Before the H. Comm. on Homeland Sec.*, 116th Cong. 46-48 (Mar. 6, 2019) (statement of Sec'y Kirstjen Nielsen, Dep't of Homeland Sec.), https://www.govinfo.gov/content/pkg/CHRG-116hhrg35380/html/CHRG-116hhrg35380.htm.

70.    The public did not believe this false representation and continued to express outrage.

71.    President Trump signed an Executive Order on June 20, 2018, purporting to address family separation.  At that time, the Administration had already forcibly separated thousands of families at the border over the course of more than two months.

72.    The Executive Order proclaimed that it was the Administration's policy "to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources."[55]  It refused to acknowledge the Family Separation Policy's existence, or that the Order departed from the status quo.  Additionally, the Executive Order did not address how the government planned to reunite the thousands of children and parents who had been forcibly separated.

73.    Officials publicly stated that the system was "unprepared" to quickly reunite families.  However, federal officials actively tried in early May 2018, if not before, to *prevent* reunification because of concerns that reuniting families "too quickly" would undermine the Policy's goal of intimidating families.[56]

74.    Migrants who are prosecuted for crossing the border illegally are typically processed, arraigned, charged, and sentenced within a couple of hours in federal court and sentenced to time served.

75.    Because ORR generally required more time to process and pick up children designated as unaccompanied from DHS custody, ORR was regularly refusing to accept children

---

[55]    Affording Congress an Opportunity to Address Family Separation, Exec. Order No. 13,841, 83 Fed. Reg. 29, 435 § 1 (June 20, 2018).

[56]    Sacchetti, *supra* note 22.

designated as unaccompanied based on a parent's criminal prosecution because their parents had returned from court and the children were no longer unaccompanied.

76.     As a result, top ICE officials feared "a situation in which the parents are back in the exact same facility as their children . . . who have yet to be placed into ORR custody" and urged ICE to work with CBP "to prevent this from happening."[57]

77.     These concerns reached a "fever pitch" in May 2018 when senior ICE officials reported that CBP was "reuniting adults with kids" at the busiest stretch of the southern border.[58] "We can't have this," one ICE official warned, arguing that "ORR needs [its] arm twisted."[59] Another referred to reuniting unlawfully separated parents and children as "a fiasco."[60]    In response, a CBP official instructed CBP agents to "cease the reunification process" in border stations.

78.     The next day, a top ICE official messaged the CBP Commissioner, his deputy, and the acting ICE director about ORR's refusal to take children whose parents had returned from court, stating: "This obviously undermines the entire effort and the Dept. is going to look completely ridiculous if we go through the effort of prosecuting only to send them to a FRC (family residential center) and out the door."[61]

79.     As of June 22, 2018, the government still had "no procedure in place for the reunification of [separated] families."[62]

---

[57]    *Id.*

[58]    *Id.*

[59]    *Id.*

[60]    *Id.*

[61]    *Id.*

[62]    *Ms. L.*, 310 F. Supp. 3d at 1140-41.

80.     On June 26, 2018, the Honorable Dana M. Sabraw of the Southern District of California held in *Ms. L. v. U.S. Immigration & Customs Enforcement* that the Family Separation Policy—which disproportionally impacted individuals from Central America, including Plaintiffs—and the manner in which it was implemented, likely violated separated families' constitutional rights.[63]

81.     Even after *Ms. L.* ordered the government to end the Family Separation Policy, the government continued to separate thousands of families.[64]

82.     Accordingly, Judge Sabraw issued a class-wide preliminary injunction prohibiting DHS from separating families, subject to certain exceptions, and ordering the government to reunify families.[65]

---

[63]   *Ms. L.*, 310 F. Supp. 3d at 1142-46 (finding that plaintiffs were likely to succeed on the merits of their substantive due process claim).  The liberty interest identified in the Fifth Amendment provides a right to family integrity and familial association.  That right was "well established" even before it was recognized in *Ms. L. See Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (stating "the relationship between parent and child is constitutionally protected"); *see also Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established.").  As *Ms. L.* and several other courts have recognized, separating families threatens that right.  *See Ms. L.*, 302 F. Supp. 3d at 1161-67 (finding plaintiffs stated a legally cognizable claim for violations of their substantive due process rights under the Fifth Amendment to the United States Constitution based on their allegations that the government had separated them from their minor children, and kept them separated from their minor children, while they were held in immigration detention and without a showing that they were unfit parents or otherwise presented a danger to their children); *see also C.M.*, 2020 WL 1698191, at *4 ("Plaintiffs have plausibly alleged that the government's separation of their families violated their constitutional rights, which is not shielded by the discretionary function exception."); *A.P.F.*, 492 F. Supp. 3d at 996 (finding "the government's practice of separating families, and the procedures used to implement this practice, likely violated due process"); *Nunez Euceda*, 2021 WL 4895748, at *3 (same); *Jacinto-Castanon de Nolasco v. U.S. Immigration and Customs Enforcement*, 319 F.Supp.3d 491, 502 (D.D.C. 2018) (a family involuntarily separated after crossing the border "likely w[ould] succeed on their substantive due process claim premised on their constitutional right to family integrity"); *J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 741 (D. Conn. 2018) (even the government "agree[d] that a constitutional violation occurred when the government separated children from their parents").

[64]   *See* John Washington, *The Government Has Taken at Least 1,100 Children from Their Parents Since Family Separations Officially Ended*, THE INTERCEPT (Dec. 9. 2019, 10:56 AM), https://theintercept.com/ 2019/12/09/family-separation-policy-lawsuit/.

[65]   *Ms. L.*, 310 F. Supp. 3d at 1140, 1141-46.  The injunction, among other things, prohibited the government from separating parents from their minor children in the future absent a determination that the parent is unfit or presents a danger to the child; prohibited the deportation of any detained parent before reunification with his or her separated children; and ordered the government to reunify parents separated from children under the age of five within 14 days, and to reunify parents separated from children aged five and older within 30 days.  *Id.* at

83.    Only after Judge Sabraw issued the injunction did the government begin to reunify families.[66]

84.    Reuniting thousands of children and parents would have been difficult no matter the circumstances, but the government's failure to track separated parents and children compounded the difficulties.

85.    Many children were even "lost in the system" with no information on where they entered the country, when, or with whom.

86.    And some remain lost even today.[67]  In April 2024, the government reported that over 1,000 children had yet to be confirmed reunified with their families.[68]

87.    After the pilot program had concluded, CBP and ORR notified other parts of the government of the deficiencies that eventually plagued the Policy's implementation.

88.    Despite these warnings, the government did not provide critical officer training, did not implement a system for tracking families, and did not develop a plan for eventual reunification.

89.    Judge Sabraw found these failures "startling."[69]  As he explained, the government routinely keeps track of "personal property of detainees in criminal and immigration proceedings,"

---

1149-50. Each of the Plaintiff-Parents in this Complaint is a member of the class in *Ms. L. See id.* at 1139 n.5 (defining parent class).

[66]    U.S. Dep't of Homeland Sec., Off. of Inspector Gen., OIG-18-84, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* 10 (Sep. 27, 2018) [hereinafter *DHS OIG Highlights*], https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

[67]    Aline Barros, *Five Years Later, Work of Reuniting Families Separated at US-Mexico Border Remains Unfinished* (June 11, 2022, 6:03 AM), https://www.voanews.com/a/five-years-later-work-of-reuniting-families-separated-at-us-mexico-border-remains-unfinished/6610677.html.

[68]    Homeland Security, *Interim Progress Report: Interagency Task Force on the Reunification of Families* (April 22, 2024), https://www.dhs.gov/sites/default/files/2024-05/24_0422_sec_frtf-interim-progress-report-final-508.pdf; *see also* Philip Bump, *Six Years Later, 1400 Children Remain Separated From Their Families*, WASH. POST (May 7, 2024, 12:06 PM), https://www.washingtonpost.com/politics/2024/05/07/immigration-family-separation/.

[69]    *Ms. L.*, 310 F. Supp. 3d at 1144.

including "[m]oney, important documents, and automobiles, to name a few."[70]  "Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children.  The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*."[71]

90.     In the end, the government successfully achieved its objective: implementing an unconstitutional policy to intentionally inflict emotional distress on parents and children.  And thousands of families—including Plaintiffs'—are still living with the consequences today.

## II.     D.R.M. AND J.J.R.S.

### A.     D.R.M. and J.J.R.S. Flee Honduras to Obtain Emergency Medical Treatment.

91.     J.J.R.S. was born in Honduras on May 21, 2014 with a congenital heart defect, a symptom of Noonan Syndrome.

92.     Noonan Syndrome is a genetic disorder characterized by, among other things, short stature, heart defects, bleeding problems, and skeletal abnormalities.  The most common heart defect in affected individuals is a narrowing of the valve that controls blood flow from the heart to the lungs—a condition called pulmonary valve stenosis.

93.     J.J.R.S. stayed in the hospital for 15 days after his birth and experienced three episodes of cardiopulmonary arrest during that period.

94.     Throughout his time in Honduras, he spent a great deal of time in the hospital for symptom management.

---

[70]  *Id.*

[71]  *Id.*; *see also C.M.*, 2020 WL 1698191, at *2 ("Federal immigration officials . . . are tasked with the care and custody of those they detain, and owe detainees at least a minimal level of care.").

95.     In Honduras, doctors and staff at a public hospital operated by the Honduran Government told D.R.M. that he and his partner should not care for their sick and disabled child, who they thought was unlikely to survive.  They told D.R.M. and his partner that J.J.R.S was taking resources away from other children.  They even suggested taking J.J.R.S. off life support and otherwise denying him medical attention, so that he would die and the hospital's resources could be diverted to other children.

96.     D.R.M. had to take J.J.R.S. to another hospital in Honduras to seek medical treatment but encountered the same issues at the new hospital.

97.     Since D.R.M. could not afford private medical insurance or treatment at a private hospital, D.R.M. decided to flee with J.J.R.S. to the United States in order to save his son's life. D.R.M. believed that there would be better medical treatments available in the United States than in Honduras.

**B.     D.R.M. and J.J.R.S. Enter the United States.**

98.     On March 16, 2018, D.R.M. and J.J.R.S. entered the United States near Hidalgo, Texas.

99.     They turned themselves in to U.S. immigration officials immediately upon arrival and requested asylum.

100.     D.R.M. explained to the officers that J.J.R.S. had a heart condition and that his purpose in coming to the U.S. was to seek emergency medical treatment for his son.

101.     Officers searched D.R.M. and J.J.R.S. and found the medication, furosemide, that J.J.R.S. took to prevent fluid from building up around his heart.  Officers threw J.J.R.S.'s heart medication in the trash.  D.R.M. insisted that his son was very ill and needed his medication and treatment.

102.    Officers brought J.J.R.S. and D.R.M. to the McAllen Medical Center in McAllen, Texas for a medical examination.  Medical staff at McAllen Medical Center listened to J.J.R.S.'s heart with a stethoscope but performed no imaging tests.  The medical staff at the McAllen Medical Center (incorrectly) diagnosed J.J.R.S. with a heart murmur.

103.    Additionally, they reviewed information about J.J.R.S.'s previously prescribed medications and instructed that J.J.R.S. should continue taking those medications.

104.    But J.J.R.S. was not provided with a replacement prescription for the furosemide that officers had discarded, and therefore had no access to his medicine.

105.    Officers must follow the CBP's "National Standards on Transport, Escort, Detention, and Search,"[72] which set forth the steps they are required to take when an individual in their custody enters the U.S. with a prescription medication from a foreign country.

106.    These National Standards require that "[a]ny detainee, not in general processing, with non-United States-prescribed medication, should have the medication validated by a medical professional, or should be taken in a timely manner to a medical practitioner to obtain an equivalent U.S. prescription."[73]

107.    Officers did not take any of these steps with regard to J.J.R.S.'s furosemide.

108.    The immigration officers then locked Plaintiffs in a small, freezing-cold holding cell.  Such "*hieleras*" violate CBP's own internal policies and standards.[74]

---

[72]    *TEDS*, *supra* note 5.

[73]    *Id*. at p. 17.

[74]    CBP issued the National Standards on Transport, Escort, Detention and Search (TEDS) in October of 2015, and CBP officers were required to abide by these standards during the period of Plaintiffs' separation and detention. Section 4.7 of the TEDS "Hold Room Standards" states that "[w]hen it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents.  Under no circumstances will officers/agents use temperature controls in a punitive manner." *TEDS* at 16.  By subjecting Plaintiffs to freezing cold temperatures deliberately in the icebox, CBP officers violated this TEDS standard.

109.    During that period of detention, the immigration officers only gave D.R.M. and J.J.R.S. a small quantity of juice and a small hamburger each.  D.R.M. would break the hamburger into smaller pieces for J.J.R.S. to eat.  Plaintiffs experienced severe thirst and hunger during this time.

110.    The officers did not give D.R.M. and J.J.R.S. anything to help keep them warm in the *hielera*.  For example, at no point did any officials offer D.R.M. and J.J.R.S. any blankets or extra clothing.  These conditions were especially harmful to J.J.R.S. given his heart condition, which causes his throat to hurt and close up when he is cold.  As a result, D.R.M. had to hold J.J.R.S. under his shirt to try to keep him warm.

111.    J.J.R.S. also experienced severe itching and flaking of the skin due to limited access to water.

112.    D.R.M. and J.J.R.S. were not allowed to freely move around the holding cell.  Any time J.J.R.S. would try to explore or move even a few feet away, immigration officials would yell at J.J.R.S. and force him to sit still in one place.

113.    D.R.M. explained to immigration officers several times that J.J.R.S. had a heart condition and needed prompt medical attention.  Despite this, government officials did not provide J.J.R.S. with adequate medical attention.

114.    The conditions in which Plaintiffs were kept were abusive and violated Defendants' own policies.

**C.    J.J.R.S. Is Forcibly Taken from D.R.M.**

115.    Approximately three or four days after J.J.R.S. and D.R.M. entered the U.S., at around 5 a.m., two male immigration officers suddenly approached J.J.R.S. and D.R.M. while J.J.R.S. was sleeping on D.R.M.'s chest.

116.    A separate female official told D.R.M. that they were going to take J.J.R.S. from him.  She then approached and forcibly pulled J.J.R.S. from D.R.M.'s arms.  The two male immigration officers restrained D.R.M. until the female official was able to pull J.J.R.S. away.

117.    J.J.R.S. woke up as he was being pulled out of his father's arms and began screaming and crying.  J.J.R.S. continued screaming and crying as the officers took him out of the room and down a long hallway.

118.    D.R.M. listened to his son's screams.  He felt terrified and devastated because he did not know what was going to happen to his three-year-old son.

119.    Later in the morning that same day, officials put D.R.M. into a van and took him to another detention center several hours away.  D.R.M. rode in the van for 6 to 8 hours without knowing where he was being taken.  For the entire trip, D.R.M. had cuffs on his hands and feet and a chain around his waist.

120.    D.R.M. asked immigration officers about what was happening to J.J.R.S. but the officers gave him no information about his son.  D.R.M. did not hear any news about J.J.R.S. and was unable to contact his partner, J.J.R.S.'s mother, until approximately twenty days after their separation.

121.    After being held in the second detention facility for approximately one month and 15 days, D.R.M. was deported back to Honduras—without his son.

122.    During this period of separation, D.R.M. was deprived of information regarding the health and safety of his son.

123.    Other than the United States Government's Family Separation Policy, there was no basis for separating J.J.R.S. from D.R.M.  For example, in conducting the separation, the government did not allege or make any showing that D.R.M. was unfit to care for or posed a danger

to J.J.R.S.  The government did not have any factual basis to make such a finding.  Nor did D.R.M.

have a criminal or medical history warranting separation.

    **D.    J.J.R.S. Is Placed into Foster Care and Undergoes Heart Surgery Alone.**

124.    Two days after J.J.R.S. was forcibly removed from his father, immigration officials

called J.J.R.S.'s mother to tell her that they had found J.J.R.S. alone but did not know anything

about D.R.M.'s whereabouts or status.

125.    They told her that unless J.J.R.S. had family in the United States, he would be put

up for adoption.

126.    Soon after J.J.R.S. was separated from his father, he was transported to New York

and placed into a foster care facility called Leake and Watts (now known as Rising Ground) in

the Bronx.

127.    J.J.R.S.'s mother was only allowed to talk to J.J.R.S. on the phone a few times after

the separation, but whenever they spoke, J.J.R.S. would say that he wanted to be with her and start

sobbing.  The foster caregiver would end the call whenever J.J.R.S. started crying.

128.    J.J.R.S.'s mother was unable to call the facility and was only allowed to

receive calls.

129.    On March 24, 2018, J.J.R.S. was evaluated for a heart murmur.

130.    During that examination, a Leake and Watts employee noted that he had been told

that J.J.R.S. had "clogged heart veins" and J.J.R.S. could "turn purple when he's irritated."

131.    On April 27, 2018, an echocardiogram was performed on J.J.R.S., which revealed

that J.J.R.S. suffered from severe pulmonary valve stenosis, that his right ventricle was severely

hypertrophied, and that he would require medical intervention involving a cardiac catheterization

and balloon valvuloplasty of his pulmonary valve.

132.    Pulmonary valve stenosis makes the right part of the heart work harder to push out blood into the lungs for oxygenation and puts extra strain and pressure on the right side of the heart.

133.    On May 8, 2018, while still in foster care, a Leake and Watts employee reported that J.J.R.S. was easily out of breath after mild play, felt warm to the touch, and, when asked what was "hurting" him, pointed to his chest.

134.    J.J.R.S. was rushed to the emergency room at the Children's Hospital at Montefiore. He was discharged the same day.

135.    On May 31, 2018, doctors performed a cardiac catheterization and balloon valvuloplasty on J.J.R.S.

136.    J.J.R.S. stayed overnight at the hospital without a parent present and was discharged the next day.

137.    Unfortunately, the surgical procedures did not alleviate J.J.R.S.'s condition, and at a follow-up visit on June 15, 2018, he was administered another echocardiogram which revealed that he had "severe pulmonary stenosis . . . in need of surgical intervention."

138.    At the June 15, 2018 check-up, the physician also referred J.J.R.S. for genetic evaluation to determine whether he might have Noonan Syndrome.

139.    After several further follow-up visits throughout the summer of 2018, J.J.R.S. was referred for a surgical repair of his pulmonary stenosis.

140.    At this point, D.R.M. had been returned to Honduras.  A doctor contacted D.R.M. and his partner about J.J.R.S.'s medical condition and provided them with information about the surgical procedure he needed to alleviate his condition.

**E.    D.R.M. and J.J.R.S. Are Reunified Seven Months After Their Separation.**

141.    On September 16, 2018, D.R.M. and his partner were granted Humanitarian Parole and allowed to enter the United States. This grant of Humanitarian Parole was the result of negotiations in the settlement of the *Ms. L.* litigation.

142.    D.R.M. and J.J.R.S.'s mother were not permitted to visit J.J.R.S. immediately after they arrived. They instead had to make an appointment to see J.J.R.S. the following day.

143.    On September 17, 2018, D.R.M. and J.J.R.S. were permitted to visit with each other after being separated for seven months.

144.    The family was only allowed to be together for two hours.

145.    When J.J.R.S. first saw D.R.M. and his mother, he did not recognize them and stared at them for a few moments.

146.    D.R.M. and J.J.R.S. noticed that J.J.R.S. looked different and seemed exhausted, nervous, and timid.

147.    Once J.J.R.S. recognized his parents, he started to cry.

148.    When the two hours of visitation time had passed and J.J.R.S. was told it was time to leave, he grabbed his parents and refused to let go.

149.    The entire family wept out of devastation that they would have to be separated yet again.

150.    J.J.R.S.'s mother and D.R.M. visited J.J.R.S. two or three more times after that, for two-hour increments only. In each of these visits, J.J.R.S. appeared nervous and anxious.

151.    In October 2018, J.J.R.S. underwent open-heart surgery. At that time, J.J.R.S. was still in the custody of the foster agency. A representative of the agency stayed in the hospital to monitor J.J.R.S. D.R.M. and his partner also stayed in the hospital.

152.    D.R.M. and his partner had finally been given custody of J.J.R.S. by the time he was released from the hospital, so they were able to bring him to their home.

153.    J.J.R.S. was terrified on the way home from the hospital and asked his parents if they could hurry home because he was afraid he would get taken away again.  J.J.R.S. also begged to not return to the foster care agency; he stated that he would even prefer to go back to Honduras over that.

154.    Over the course of the following year, J.J.R.S. would routinely wake up in the middle of the night, screaming and crying out of fear that he would be taken from his parents again. This happened almost every night, and often required one of J.J.R.S.'s parents to lay down next to him to get him to fall asleep again.

**F.    The Policy Caused Plaintiffs Extensive Suffering and Harm.**

155.    D.R.M. and J.J.R.S. were both traumatized by their separation.

156.    Although he is only ten years old now, J.J.R.S. exhibits symptoms of depression.

157.    J.J.R.S. rarely speaks to his parents about his experiences being alone in the hospital and in foster care, and his parents avoid talking to him about the separation because it makes J.J.R.S. upset and uncomfortable.  However, he occasionally asks his parents why he had to be taken away from his father.

158.    J.J.R.S. and his parents now live on a busy street, where police cars and ambulances frequently pass by.  Every time J.J.R.S. hears their sirens or sees their flashing lights, he becomes panicked and agitated because he believes that the police are coming to take him away from his parents again.

159.    These experiences are also stressful for J.J.R.S.'s parents, as they worry that getting agitated and upset may aggravate J.J.R.S.'s heart condition.

160.    J.J.R.S. frequently wets his bed and is afraid of being alone in his bedroom at night.

161.    When J.J.R.S. first started going to school, he was afraid of the school's security guard.  His parents have repeatedly told him that the security guard is there to protect him and will not harm him, but J.J.R.S. remains fearful.

162.    The mental and emotional distress D.R.M. and J.J.R.S. experienced and continue to experience would not have occurred but for their separation.

163.    The explicit purpose of the Policy was to inflict trauma on families like D.R.M. and J.J.R.S. who enter the United States without documentation, in order to deter other families from coming.  Accordingly, Plaintiffs' mental and emotional distress was a foreseeable and intended consequence of their separation.

164.    This trauma was exacerbated by the fact that J.J.R.S. has a serious heart condition and, while they were separated, D.R.M. was unable to monitor his son's medical condition and was not apprised of his son's health or whereabouts.

165.    Additionally, at the age of just three years old, J.J.R.S. had to experience numerous hospital visits (including trips to the ER) and undergo multiple procedures, in a foreign country and a foreign language, without his parents.

166.    The government officials who separated D.R.M. and J.J.R.S. knew or reasonably should have known that the separation caused a risk of aggravated harm because, among other things, they were explicitly told about J.J.R.S.'s medical condition.

## CLAIMS FOR RELIEF

### Count I: Intentional Infliction of Emotional Distress

167.    Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

168.    Defendant's employees acted intentionally and/or recklessly through their implementation of the Policy.

169.    Defendant's employees engaged in conduct that was extreme and outrageous.

170.    Defendant's employees engaged in conduct that caused Plaintiffs severe emotional distress.

171.    Under the FTCA, Defendant is liable to Plaintiffs for intentional infliction of emotional distress.

## Count II: Negligence

172.    Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

173.    Defendant's employees had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

174.    Defendant's employees violated those duties by throwing out J.J.R.S.'s medication (furosemide) despite being told that he had a serious heart condition and despite medical providers' instruction that J.J.R.S. should continue taking his medication.

175.    Defendant's employees violated those duties by refusing to provide J.J.R.S. with prompt medical attention despite being told that he had a serious heart condition.

176.    Defendant's employees violated those duties by sending J.J.R.S. to a foster care facility without notifying them of J.J.R.S.'s serious heart condition.

177.    Defendant's employees violated those duties by forcibly subjecting Plaintiffs to prolonged separation without their consent.

178.    Defendant's employees violated those duties by subjecting Plaintiffs to inhumane detention conditions prior to their separation.

179.    Defendant's employees violated those duties by failing to develop and implement a system for tracking the existence of D.R.M.'s relationship with J.J.R.S., withholding from

D.R.M. any information about J.J.R.S.'s location or welfare, and severely limiting Plaintiffs' ability to communicate with each other.

180.    Defendant's employees failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

181.    As a direct and proximate result of the conduct described in this Complaint, Plaintiffs suffered substantial damages.

182.    Under the FTCA, Defendant is liable to Plaintiffs for negligence.

### Count III: Loss of Consortium

183.    Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

184.    By engaging in the alleged acts herein, Defendant's employees committed the torts of negligence and intentional infliction of emotional distress and caused substantial trauma and significant interference in the parent-child relationship.

185.    Plaintiffs have suffered severe, permanent, and disabling injuries.  They now must contend with the long-term effects and emotional and psychological trauma caused by Defendant's employees, which substantially interfere with D.R.M. and J.J.R.S.'s capacity to interact with one another in a normally gratifying way.  As described above, J.J.R.S. exhibits symptoms of depression and stress that are atypical for a child of his age.

186.    As a direct and proximate cause of the referenced conduct, Plaintiffs suffered and continue to suffer substantial trauma, loss of society, companionship, care, support, affection, and substantial damages.

187.    Under the FTCA, Defendant is liable to Plaintiffs for loss of consortium.

## Count IV: Tortious Interference with Familial Relationships

188.    Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

189.    Plaintiffs have a right to establish or maintain a parental or custodial relationship with one another.

190.    Defendant's employees intentionally interfered with the parental or custodial relationship between Plaintiffs by forcibly separating them from one another.

191.    As set forth more particularly in the preceding paragraphs, by the various acts and omissions of Defendant's employees and breaches of duties of care as described herein, Defendant's employees caused Plaintiffs to lose the society, affection, and companionship of each other and suffer harm and damages, including, but not limited to, mental and emotional distress.

192.    Under the FTCA, Defendant is liable to Plaintiffs for tortious interference of familial relationships.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

193.    Compensatory damages in the amount of $3,000,000 for harm to D.R.M. resulting from Defendant's conduct;

194.    Compensatory damages in the amount of $3,000,000 for harm to J.J.R.S. resulting from Defendant's conduct;

195.    Such other and further relief that the Court may deem just and appropriate, including all equitable relief to which Plaintiffs are entitled.

Dated:  January 23, 2025                     Respectfully submitted,
        Newark, New Jersey


                                             By:   s/ Anne M. Collart
                                                   Anne M. Collart
                                                   **GIBBONS P.C.**
                                                   One Gateway Center
                                                   Newark, NJ 07102-5310
                                                   T: (973) 596-4500
                                                   F: (973) 596-0545
                                                   E: acollart@gibbonslaw.com

                                                   **KIRKLAND & ELLIS LLP**
                                                   Amanda Lamothe-Cadet
                                                   (*pro hac vice* forthcoming)
                                                   Maylynn Chen
                                                   (*pro hac vice* forthcoming)
                                                   601 Lexington Avenue
                                                   New York, NY 10022
                                                   T: (212) 446-4800
                                                   E: amanda.lamothecadet@kirkland.com
                                                   E: maylynn.chen@kirkland.com

                                                   **N.Y. LEGAL ASSISTANCE GROUP**
                                                   Elizabeth Jois (*pro hac vice* forthcoming)
                                                   Kate L. Fetrow (*pro hac vice* forthcoming)
                                                   Genesis Miranda (*pro hac vice* forthcoming)
                                                   100 Pearl Street, 19th Floor
                                                   New York, NY 10003
                                                   T: (212) 613-6510

                                                   *Attorneys for Plaintiffs*

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

Pursuant to Local Civil Rule 11.2, the undersigned hereby certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

By:   s/Anne M. Collart

Anne M. Collart

Dated: January 23, 2025

Newark, New Jersey