<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| D.R.M., on his own behalf and on behalf of his minor child, J.J.R.S., <br><br> *Plaintiff,* <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> *Defendant.* | Civil No.: 25-cv-696 (KSH) (SDA) <br><br><br><br> <u>**OPINION**</u> |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.      Introduction**

Plaintiffs D.R.M. and his son, J.J.R.S.,[1] have sued the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2401, 2671-80, for negligence, intentional infliction of emotional distress, loss of consortium, and tortious interference with familial relationships.  Their claims arose after U.S. immigration officers took J.J.R.S., then three years old, away from D.R.M. while they were detained after their arrival in the United States in 2018.  The two remained separated for seven months.  In July 2025, the United States moved to dismiss the complaint for lack of subject matter jurisdiction.  Briefing concluded on January 15, 2026.  The Court held oral argument on February 11, 2026, and for the reasons set forth below, denies the motion with the exception of the claim for loss of consortium, which is dismissed.

**II.      Background**

**A.      D.R.M. brings J.J.R.S. from Honduras to the United States**

The complaint alleges the following.  J.J.R.S., who is now 11, was born in May 2014 in Honduras.  (D.E. 1, Compl. ¶ 91.)  He has Noonan Syndrome, a genetic disorder that causes,

---

[1] Plaintiffs were granted leave to proceed under pseudonyms.  (D.E. 4.)

among other issues, heart defects. (*Id.* ¶¶ 91-92.) The condition "requires constant medical attention"; untreated, it can cause heart failure and death. (*Id.* ¶ 20.)

J.J.R.S. spent 15 days in the hospital after his birth, going into cardiopulmonary arrest three times in that period, and thereafter continued to spend "a great deal of time" in hospitals due to his condition. (*Id.* ¶¶ 93-94.) Medical providers there discouraged D.R.M. and his partner from continuing to care for their sick child because "he was taking resources away from other children." (*Id.* ¶¶ 95-96.) They suggested removing him from life support and "otherwise denying him medical attention, so that he would die and the hospital's resources could be diverted to other children." (*Id.* ¶ 95.) D.R.M. was unable to afford private medical insurance or have J.J.R.S. treated at a private hospital, and decided to take him to the United States, believing it would offer better treatments. (*Id.* ¶ 97.)

On March 16, 2018, plaintiffs entered the United States "near Hidalgo, Texas"; they "turned themselves in to U.S. immigration officials immediately upon arrival and requested asylum." (*Id.* ¶¶ 98-99.) D.R.M. told the officers that J.J.R.S. had a heart condition and that he had come to seek emergency medical treatment. (*Id.* ¶ 100.) Father and son were searched, and officers found and threw out J.J.R.S.'s heart medication, furosemide. (*Id.* ¶ 101.) They were then taken to a medical center, where after a cursory examination J.J.R.S. was misdiagnosed with a heart murmur. (*Id.* ¶ 102.) He was directed to keep taking his previously prescribed medications, which the doctors did not replace. (*Id.* ¶¶ 103-04.) By discarding this medication and refusing to replace it, the officers assertedly disregarded Customs and Border Protection ("CBP") standards and policies governing detainees. (*Id.* ¶¶ 105-07.)

For the next three to four days, D.R.M. and J.J.R.S. were confined in "a small, freezing-cold holding cell"—a *hielera*, or icebox—with no blankets or extra clothing. (*Id.* ¶¶ 108, 110.)

2

This punitive use of cold temperatures also was contrary to CBP's own policies.  (*Id.* ¶ 108.)  The cold was particularly difficult for J.J.R.S. because his heart condition "causes his throat to hurt and close up when he is cold."  (*Id.* ¶ 110.)  D.R.M. attempted to warm him by holding him under his shirt.  (*Id.*)  The pair was fed only "a small quantity of juice and a small hamburger each."  (*Id.* ¶ 109.)  Very limited access to drinking water caused J.J.R.S. "severe itching and flaking of the skin."  (*Id.* ¶ 111.)  The two could not freely move around the cell, and officers regularly yelled at J.J.R.S. when he tried.  (*Id.* ¶ 112.)

### B.    J.J.R.S. is separated from D.R.M., who is deported

After several days, at around 5:00 in the morning, "two male immigration officers suddenly approached J.J.R.S. and D.R.M. while J.J.R.S. was sleeping on D.R.M.'s chest."  (*Id.* ¶ 115.)  A third officer, a woman, told D.R.M. that J.J.R.S. was being taken away, "then approached and forcibly pulled J.J.R.S. from D.R.M.'s arms" while the other officers restrained him.  (*Id.* ¶ 116.)  J.J.R.S. woke up and began screaming and crying as he was carried away.  (*Id.* ¶ 117.)  D.R.M. was taken to a detention center six to eight hours away.  He was not told where he was going or where J.J.R.S. was.  (*Id.* ¶ 119.)

D.R.M. had no criminal history or medical history that would suggest he was unfit to care for J.J.R.S.; plaintiffs deduce that the only reason J.J.R.S. was taken away was the family separation policy.  (*Id.* ¶ 123.)  It was another 20 days before D.R.M. heard anything about J.J.R.S. or could contact his partner, J.J.R.S.'s mother.  (*Id.* ¶ 120.)  After being held for a month and 15 days at the second facility, D.R.M. was deported to Honduras.  (*Id.* ¶ 121.)

### C.    J.J.R.S. is sent to foster care in the Bronx and undergoes medical procedures

Two days after J.J.R.S. was taken from his father, "immigration officials called J.J.R.S.'s mother to tell her that they had found J.J.R.S. alone but did not know anything about D.R.M.'s

whereabouts," and that "unless J.J.R.S. had family in the United States, he would be put up for adoption." (*Id.* ¶¶ 124-25.) J.J.R.S. had, in fact, been taken to a foster care facility in Bronx, New York. (*Id.* ¶ 126.) J.J.R.S.'s mother was allowed limited contact with him: she could only receive calls from the facility, not place them, and could only talk to him "a few times." (*Id.* ¶ 127.) On these calls, J.J.R.S. would cry, and the caregiver would end the call. (*Id.*)

For the next months, J.J.R.S. continued in foster care up north. On March 24, 2018, he was evaluated for a heart murmur. (*Id.* ¶ 129.) During the exam, an employee of the foster care facility "noted that he had been told that J.J.R.S. had 'clogged heart veins' and [he] could 'turn purple when he's irritated.'" (*Id.* ¶ 130.) On April 27, 2018, an echocardiogram showed that J.J.R.S. had severe pulmonary valve stenosis and a severely hypertrophied right heart ventricle, and would need a cardiac catheterization and a balloon valvuloplasty of his pulmonary valve. (*Id.* ¶ 131.)

On May 8, 2018, an employee of the foster care center "reported that J.J.R.S. was easily out of breath after mild play, felt warm to the touch, and pointed to his chest when he was asked what was hurting him. (*Id.* ¶ 133.) He was taken to the emergency room and discharged that day. (*Id.*) Several weeks later, on May 31, 2018, he had the cardiac catheterization and balloon valvuloplasty, staying overnight; by this point, he still had no parent with him. (*Id.* ¶¶ 135-36.)

The procedure did not help, and on June 15, 2018, J.J.R.S. had another echocardiogram, which revealed "'severe pulmonary stenosis . . . in need of surgical intervention,'" and prompted the doctor to refer him for testing to determine if he had Noonan Syndrome. (*Id.* ¶¶ 137-38.) After several more doctor visits, he "was referred for a surgical repair of his pulmonary stenosis." (*Id.* ¶ 139.)

4

On September 17, 2018, over six months after J.J.R.S. was taken away from his father, his parents were allowed to visit him for two hours.  (*Id.* ¶¶ 143-44.)  He did not initially recognize them and appeared "exhausted, nervous, and timid." (*Id.* ¶¶ 145-46.)  By the end of the visit, he did not want to let go of them.  (*Id.* ¶ 148.)  Several more two-hour visits followed.  (*Id.* ¶ 150.)

J.J.R.S. was still in foster care when he had open-heart surgery in October 2018.  (*Id.* ¶ 151.)  His parents stayed with him in the hospital—along with a representative of the foster care agency to "monitor" him.  (*Id.* ¶ 151.)  By the time J.J.R.S. was released from the hospital, his parents had been granted custody of him and brought him to their home. (*Id.* ¶ 152.)  As of the filing this action, the family was living in New Jersey.  (*Id.* ¶¶ 19, 21, 158.)

### D.      The family separation policy

According to plaintiffs, what happened to them was the result of the government's family separation policy implemented in 2017 and 2018, and as discussed *infra*, their reunion happened as a result of litigation over it.  (*See* Compl. ¶¶ 1-8, 24-42.)

Describing the policy, plaintiffs allege that in March 2017, the Department of Health and Human Services ("HHS") secretary confirmed that family separation was being considered as an immigration deterrent, and an April 2017 Attorney General memorandum directed federal prosecutors to prioritize criminal enforcement of immigration offenses, including 8 U.S.C. §§ 1324 and 1325.  (*Id.* ¶¶ 27-28.)

In June 2017, a program that allowed family asylum seekers to remain in the community and receive services during their proceedings was terminated, and in July 2017, the El Paso sector of the southern border, under CBP's auspices, piloted a family separation program whereby charges for improper entry under 8 U.S.C. § 1325 were "aggressive[ly] prosecut[ed],"

including against parents with young children. (*Id.* ¶ 31.) Parents were detained and children were forcibly taken away. (*Id.*) The children, who had arrived with their parents, were designed unaccompanied minors and placed in the custody of HHS's Office of Refugee Resettlement ("ORR"). (*Id.* ¶ 32.) ORR wasn't told that the children had arrived with parents, and the government did not keep track of separated families. (*Id.*)

In December 2017, the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") exchanged a memo on "Policy Options to Respond to Border Surge of Illegal Immigration," largely reflecting the El Paso pilot. The memo discussed the deterrent value of reporting on the increased prosecution and the separation of adults from their children. (*Id.* ¶¶ 34-35.) Staff on the ground noted an increase in separations around the time of the memo, and also during the pilot program in El Paso. (*Id.* ¶¶ 36-38, 53(c).) Congressional objections, including on February 8, 2018, did not change the administration's course. (*See id.* ¶ 39.) According to plaintiffs, when D.R.M. and J.J.R.S. arrived at the border in March 2018, "the Family Separation Policy was well underway at border crossings throughout Texas, including in Hidalgo." (*Id.* ¶ 42.)

The policy formally launched on April 6, 2018 as a "Zero Tolerance Policy" that spread the pilot program across the entire southern border. (*Id.* ¶ 43.) DOJ required that all persons crossing the border be criminal prosecuted, even if they were seeking asylum or accompanied by children. (*Id.* ¶¶ 43-45.) Consistent with this mandate, on May 4, 2018, DHS directed CBP to refer adults arriving in family units for prosecution. (*Id.* ¶ 44.) In practice, "the government designated *every* family unit adult who crossed the border between ports of entry as amenable for prosecution and separated the adults and children before any decision was made whether to actually prosecute." (*Id.* ¶ 50.) This designation rendered the adult not "available to provide

care and physical custody" to their children, who became "unaccompanied alien child[ren]," and had to be transferred to the custody of HHS, per 8 U.S.C. § 1232(b)(3). (*Id.* ¶ 51.)

Plaintiffs allege the government was pursuing the express goal of deterring border crossings by imposing the known and wide-reaching harms of separating children from their parents. (*Id.* ¶¶ 54-55.) That the government was aware of the harm is shown, they assert, by statements throughout 2017 and 2018 by the Attorney General and DHS secretary articulating this very objective. (*Id.* ¶ 55.) As of around May 2018, federal officials were actively seeking to prevent reunification of separated families, again as a means of deterrence. (*Id.* ¶¶ 73-78.)

Also in pursuit of deterring arrivals, the family separation policy treated detained families badly by subjecting them to "increasingly inhumane and unsafe conditions," including being deprived of adequate or clean food and water, bathroom access, bedding, and places to sleep, while the facilities were kept frigid and the lights stayed on around the clock. (*Id.* ¶¶ 57-60.) "[M]any families went days or weeks without access to clean water, showers, soap, or toothpaste." (*Id.* ¶ 61.) Families had to watch as other children were taken away from their parents with no information about where the children were going. (*Id.* ¶¶ 63-64.)

In a case that brought a legal challenge to the policy, the Honorable Dana M. Sabraw of the Southern District of California entered a preliminary injunction on June 26, 2018. (*Id.* ¶ 80 (citing *Ms. L. v. United States Immigration & Customs Enforcement*, 310 F. Supp. 3d 1133 (S.D. Cal. June 26, 2018) (hereafter "*Ms. L.*").) On September 16, 2018, after negotiations in the settlement of that case, D.R.M. and his partner were granted humanitarian parole into the United States. (*Id.* ¶ 141.) As discussed earlier, their reunion with J.J.R.S. followed.

7

### E.    The impact on J.J.R.S. and D.R.M.

The complaint alleges that even after the family was reunited, J.J.R.S. and D.R.M. continued to experience negative effects from the separation.  On the way home from the hospital, J.J.R.S. was "terrified . . . and asked his parents if they could hurry home" so he wouldn't be taken again.  (Compl. ¶ 153.)  He "begged not to return to the foster care agency; he stated that he would even prefer to go back to Honduras over that."  (*Id.*)  For the next year, he awoke almost every night "screaming and crying out of fear that he would be taken from his parents again."  (*Id.* ¶ 154.)

His difficulties reportedly persist in the form of depression, and he occasionally asks why he had to be taken away.  (*Id.* ¶¶ 156-57.)  He wets his bed, is afraid of being alone at night, and becomes panicked at police and ambulance sirens, a frequent occurrence on the busy road where the family lives.  (*Id.* ¶¶ 158, 160.)  He was scared of the school security guard when he began attending school.  (*Id.* ¶ 161.)  J.J.R.S.'s parents remain "traumatized by the[] separation" and worry that his agitation will aggravate J.J.R.S.'s heart condition.  (*Id.* ¶¶ 155, 159.)

### F.    The lawsuit

On March 12, 2020, plaintiff submitted administrative claims to DHS, CBP, HHS, United States Citizenship and Immigration Services, and United States Immigration and Customs Enforcement ("ICE").  (*Id.* ¶ 16.)  There was no final disposition on the agency level, and on January 23, 2025, plaintiffs filed this action.  (*Id.* ¶ 17; *see generally* Compl.)  Plaintiffs assert claims under the FTCA for intentional infliction of emotional distress (Count 1); negligence (Count 2), loss of consortium (Count 3), and tortious interference with familial relationships (Count 4).  The government filed its motion to dismiss on July 18, 2025.

### G. The Government's Motion to Dismiss

The government's motion relies on several declarations that narrate details of plaintiffs' arrival.[2]  The thrust of its case for dismissal is that immigration officials were discharging governing legal obligations when they took J.J.R.S. away from this father; that a statutory framework, not the "Zero Tolerance Policy," drove plaintiffs' separation.

#### 1.  Plaintiffs' arrival and detention as governed by statutory mandates

According to the government, on March 16, 2018, plaintiffs entered at the Hidalgo, Texas port of entry, applied for admission, and requested asylum.  (D.E. 26, Moving Br. 8; D.E. 26-3, Harris Decl. ¶¶ 3-6 & Ex. A.)  Exhibit A to the Harris Declaration, which is D.R.M.'s Form I-213, Record of Deportable/Inadmissible Alien, reflects that D.R.M. was previously deported in 2016 for illegal entry and discloses that he had siblings in New Jersey.  (Harris Decl., Ex. A.)

The Form I-213 continues: "[D.R.M.] appears to be inadmissible pursuant to [INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I)].  Subject was processed as Expedited Removal with Credible Fear/Detained. . . . . Subject reported that he is in good health and is not taking any medications."  (*Id.*)   On the subject of placement, "Detention placement for family unit has been denied by ICE/ERO- Male head of household.  Subjects [sic] minor son was processed for NTA/D as an unaccompanied alien and turned over to the custody of [the Office of Refugee Resettlement] due to the fact that minor[']s legal guardian was previously removed from the United States.  Minor[']s legal guardian was processed for ER/CF and turned over to the custody

---

[2] D.E. 26-1, Declaration of Michael Curl, Paralegal Specialist with CBP ("Curl Decl."); D.E. 26-2, Declaration of Byoung Park, Acting Deputy Assistant Director of the Juvenile & Family Division in ICE Enforcement & Removal Operations ("ERO") ("Park Decl."); D.E. 26-3, Declaration of Rodney Harris, Supervisory Program Manager, Border Security Division of Laredo Field Office, CBP, Dept. of Homeland Security ("Harris Decl.").

of ICE/ERO at the Port Isabel Detention Center . . . to await a credible fear interview." (*Id.* at 3-4.)

J.J.R.S.'s Form I-213, which is Exhibit B to the Harris Declaration, states in pertinent part that a patdown was conducted both and "yielded negative results." (Harris Decl., Ex. B, at 2.) "Subject [D.R.M.] claimed his son and him where [sic] in good health." (*Id.*) Because D.R.M. was found to have been previously removed from the country, he was processed "as an ER/CF [Expedited Removal/Credible Fear detained individual] and [J.J.R.S.] was processed as an unaccompanied minor, NTA [Notice of Appear]-Detained . . . ." (*Id.*)

The form continued: "When [D.R.M.] was notified that his son and he were going to be processed separately, [D.R.M.] claimed his son had a heart problem since birth. Subject [J.J.R.S.] was taken to the McAllen Medical Center for evaluation [and] was medically cleared for detention and travel by the McAllen Medical Center." (*Id.* at 3.)

Per the government, plaintiffs were mandatorily detained under 8 U.S.C. § 1225(b)(1) as applicants for admission and were not immediately removed due to their asylum request. (D.E. 26, Moving Br. 1, 3-4.) ICE's "very limited capacity to detain family units" and denial of family detention placement for D.R.M. and J.J.R.S. meant that D.R.M. was detained in a secure facility until removal from the United States and J.J.R.S. was transferred to the ORR as an unaccompanied child under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232(a)(3), (b)(3), and to foster care. (*Id.* at 1, 3-4, 7; *see also* 6 U.S.C. § 279.) Discretion to temporarily parole and release individuals in plaintiffs' position was only available "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," with federal courts having no jurisdiction to review the exercise of discretion in granting or denying parole. (*Id.* at 4 (quoting 8 U.S.C. § 1182(d)(5)(A) and citing *Ashish v. Att'y Gen.*, 490 F. App'x

10

486, 487 (3d Cir. 2013) & 8 U.S.C. § 1252(a)(2)(B)(ii).)  And, the government argues, it has the authority to decide where "aliens detained pending removal or a decision on removal" will be placed in detention.  (*Id.* (citing 8 U.S.C. § 1231(g).)

The government also cites the *Flores* Agreement, a settlement agreement that requires DHS to transfer minors who can't be released from custody expeditiously to a non-secure, state-licensed facility.  As of March 2018, ICE had only three family residential centers that complied with the *Flores* Agreement, which had limited capacity, and only one could accept families with a male head of household .   (D.E. 26, Moving Br. 4-6; D.E. 26-2, Park Decl. ¶¶ 5-14.)

### 2. Plaintiffs' administrative claims as limited in scope

The government's motion attaches a copy of plaintiffs' March 12, 2020 administrative tort claim.  (D.E. 26-1, Curl Decl. ¶ 4 & Ex. A.)

The claim is embodied in a letter from an attorney at Gibson Dunn, dated March 12, 2020, addressed to legal counsel at DHS, CBP, USCIS, ICE, and DHS.  The letter, with attachments, is submitted on behalf of both plaintiffs, and summarizes the substance of their claims thus:

> In the attached, we detail how federal government officers violated Mr. R███'s and his son J███'s rights by forcibly separating them from each other without notice or information. Mr. R███ was subsequently detained without his child for weeks, and he was not informed of what had happened to his then three-year-old son for several days. J███ was ultimately placed in a foster care facility in New York. Mr. R███ and J███ were and remain to this day severely traumatized by their separation and detention due to the actions of U.S. government officials. Their trauma was exacerbated by the fact that J███ suffered from a serious, congenital heart defect, of which Mr. R███ informed federal government officials upon entering the country, and which threatened J███'s life. Mr. R███ was later deported to Honduras, while J███ remained in New York, without knowing if his son's serious medical condition was being appropriately attended to or if J███'s health was in danger. Mr. R███ and his son both continue to experience emotional suffering and psychological trauma due to this experience.
>
> We are submitting these claims without the benefit of formal discovery. Claimants reserve the right to amend or supplement their claims.

11

(D.E. 26, Curl Decl., Ex. A, at 2.)  The Standard Form 95 included for each plaintiff cites their injuries as having arisen from their forcible separation from each other, leading to "severe emotional distress, loss of enjoyment of life, other harm, and damages."  (*Id.*, at pages 7, 9 of 13.)[3]  In an attachment to these forms, plaintiffs' representative expanded on the description of events found in the cover letter and previewed the legal theory animating this lawsuit: that the family separation policy aimed to inflict extreme trauma on arriving families, plaintiffs included, so as to deter other families from attempting to come to enter the United States.  (*Id.*, at page 12-13 of 13.)

### 3.  Dismissal Arguments

The government, characterizing plaintiffs' allegations in Count 1 as separate, standalone negligence claims, asserts that to the extent they bring claims for depriving J.J.R.S. of his medicine, deficient medical care, and a challenge to the conditions of confinement, these were not administratively exhausted.  (D.E. 26, Moving Br. 11.)  Under this theory, the only live claims are those relating to plaintiffs' separation at the border, which "occurred after D.R.M. was placed in expedited removal and detention under 8 U.S.C. §§ 1182(a)(7), 1225(b)(1), and ICE made the discretionary decision to deny family unit detention at Berks FRC, which had limited capacity."  (*Id.* at 16.)  "Because of D.R.M.'s continuing, mandatory detention, and in accordance with governing legal obligations, CBP designated J.J.R.S. as an unaccompanied child, and placed him in the 'least restrictive setting that is in the best interest of the child.'"  (*Id.*)  This sequence, the government argues, implicates the discretionary function and due care exceptions to the FTCA.

---

[3] Pagination for these form excerpts is that assigned by the CM/ECF system.

Specifically: (1) ICE discretionarily denied family unit placement and processed D.R.M. as expedited removal with credible fear/detained, (2) CBP made a decision that was required by statute (8 U.S.C. § 1232(b)(3)) to transfer J.J.R.S. to ORR as an unaccompanied alien child (UAC), and (3) ORR made a discretionary decision to place J.J.R.S. in a foster facility.  (*Id.* at 17-18.)  Decisions (1) and (3) were discretionary (discretionary function exception), and decision (2) was required (due care exception), per defendant.  To the extent plaintiffs challenge the lack of a tracking system, that was discretionary.  (*Id.* at 18.)  And while unconstitutional acts would not be shielded by the discretionary function exception, plaintiffs cannot show that their separation was the result of a "mandatory Executive policy"; neither the Zero Tolerance Policy nor a precursor policy applied to them.  (*Id.* at 24-25.)  If the policy *had* applied to them, the government says, D.R.M. would have to be deemed amenable to prosecution under 8 U.S.C. § 1325, and that didn't happen.  (*Id.* at 26-27.)[4]

Finally, the government argues that plaintiffs have failed to plausibly allege viable claims for relief under Texas law, which itself is another jurisdictional defect.  (*Id.* at 34-35.)

**H.  Plaintiffs' Opposition**

Plaintiffs counter that they properly exhausted their claims.  (D.E. 39, Opp. Br. 9-11.) They reject that the discretionary function exception to the FTCA protects what the government did because the family separation policy was unconstitutional, unlawful, and did not vest discretion in governmental actors.  Instead, it dictated how they had to act.  (*Id.* at 11, 15-25.)

---

[4] Defendant also argues that the allegedly unexhausted "claim" challenging plaintiffs' conditions of confinement would be barred even if exhausted, (1) by operation of the discretionary function exception, because how the government operates detention facilities involves discretionary decisions susceptible to policy considerations, and (2) to the extent it purports to bring a constitutional tort claim, because private persons could not bring such a claim, and under § 1346(b), the government has waived immunity only to the extent a private person would be liable.  (*Id.* at 33-34.)

The policy, they continue, violated the Fifth Amendment's due process and equal protection clauses; misapplied the statute on unaccompanied alien children, 6 U.S.C. § 279; violated the *Flores* Agreement; and violated the government's own internal policies. (*See id.* at 15-25.)

Plaintiffs argue the due care exception requires proof that (1) a statute or regulation specifically prescribes a course of action, and (2) the officer exercised due care in following that statute or regulation. (*Id.* at 25-26 (citing *Welch v. United States*, 409 F.3d 646 (4th Cir. 2005)). The Court needn't go beyond the first step, plaintiffs assert, because an executive policy, not a statute or regulation[5] that dictated their separation from each other. (*Id.* at 26.) Nor could the second prong be met, plaintiffs argue, because the government's agents failed to exercise due care in transferring J.J.R.S. to ORR custody. (*Id.* at 27-28.) Substantively, plaintiffs contend that their claims are adequately pleaded under either Texas or New York law, as applicable.

## I.  The Government's Reply

The government's reply reiterates its opening arguments, while also asserting that plaintiffs' positions represent a "paradox," in which the claims are not systemic because they were committed by individual officers, but were also the result of an overarching policy such that individual officers did not have discretion. (D.E. 64, Reply 1.)

## III.  Standard of Review

### A.  Rule 12(b)(1) Motions to Dismiss

A motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) may take the form of either a facial or factual attack. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). The distinction drives how the pleading is reviewed. A facial

---

[5] Specifically, TVPRA, which the government relies on: plaintiffs counter that the custody transfer to ORR happened before that statute would have been implicated.

14

attack "considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example, it does not present a question of federal law, or because there is no indication of a diversity of citizenship among the parties, or because some other jurisdictional defect is present." *Id.* at 358.

A court ruling on such a motion "considers only the complaint, viewing it in the light most favorable to the plaintiff." *Long v. SEPTA*, 903 F.3d 312, 320 (3d Cir. 2018). In substance, the standard for a Rule 12(b)(6) motion applies to a facial attack on subject matter jurisdiction under Rule 12(b)(1): the Court is limited to the complaint allegations and a limited universe of additional materials (*e.g.*, documents referenced in and attached to the complaint) and construes those allegations in plaintiffs' favor. *Aichele*, 757 F.3d at 358; *see also Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) ("In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.").

A factual attack, by contrast, argues that subject matter jurisdiction is lacking "because the facts of the case . . . do not support the asserted jurisdiction." *Aichele*, 757 F.3d at 358. In evaluating such a motion, the Court affords no presumption of truthfulness to the complaint allegations; plaintiffs have the burden of proving subject matter jurisdiction; and the Court can look outside the pleadings to make factual findings relative to jurisdiction. *CNA v. United States*, 535 F.3d 132, 139, 145 (3d Cir. 2008) (citations omitted); *accord S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 332 (3d Cir. 2012).

The United States, which relies on several declarations, has mounted a factual challenge to subject matter jurisdiction. The Court can therefore look beyond the complaint, but at the same time it cannot require of plaintiffs the same level of jurisdictional proof would be required

15

at trial at this pleadings stage. *See DeMolick v. United States*, No. 22-1973, 2023 WL 3562979, at *2 (3d Cir. May 19, 2023) ("When a factual attack involves 'intertwined' issues of both jurisdiction and merits, a district court must require 'less of a factual showing than would be required to succeed at trial' to establish jurisdiction." (quoting *CNA*, 535 F.3d at 145)). "[I]f a plaintiff plausibly alleges a basis for jurisdiction, the district court has discretion to order limited discovery to resolve any material factual dispute." *Id.*

The government has also challenged the viability of plaintiffs' substantive claims on Rule 12(b)(6) grounds. For claims asserted through the FTCA, the injury caused by the governmental employee's act or omission must have been "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Brownback v. King*, 592 U.S. 209, 212 (quoting 28 U.S.C. § 1346(b)). Functionally, that means that a plausibly pleaded state law claim is a necessary element of an FTCA claim, and that *failure* to plausibly plead that state law claim amounts to a jurisdictional defect because for the FTCA's immunity waiver to kick in and allow jurisdiction to attach, all FTCA elements must be satisfied. *See id.* at 217-18. For the plausibility analysis, the Court "tak[es] the factual allegations as true, disregard[s] legal conclusions, and draw[s] all reasonable inferences in the plaintiff's favor," *Migliore by Migliore v. Vision Solar LLC*, 160 F.4th 79, 86 (3d Cir. 2025), and asks whether the factual allegations "permit[] a reasonable inference that the defendant is liable for the misconduct alleged," *Doe v. University of Sciences*, 961 F.3d 203, 208 (3d Cir. 2020) (citations omitted).

**B. FTCA Claims**

"The United States of America, as a sovereign, is immune from suit unless it consents to be sued." *Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008). Plaintiffs' claims are

16

asserted through the vehicle of the FTCA, which "waives the federal government's sovereign immunity for the negligent actions of its employees." *Xi v. Haugen*, 68 F.4th 824, 837 (3d Cir. 2023). The statute supplies the bounds of that waiver. Under 28 U.S.C. § 1346(b)(1), the government's immunity is waived for certain injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674. *CNA*, 535 F.3d at 138 (section 1346(b)(1) "allows plaintiffs to bring claims based on the action of [g]overnment employees when private persons engaging in analogous behavior would be liable under state law").

There are exceptions to the FTCA's immunity waiver. The two invoked here, the discretionary function and due care exceptions, both come from 28 U.S.C. § 2680(a), which states that the FTCA's immunity waiver doesn't apply to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

With respect to the discretionary function exception, the government has the burden to show that the exception applies. *Merando*, 517 F.3d at 154; *S.R.P.*, 767 F.3d at 333. The initial task is to identify the governmental conduct being challenged. *S.R.P.*, 767 F.3d at 332. Then, the Court engages in a two-part inquiry that asks first "whether the act giving rise to the alleged injury and thus the suit involves an 'element of judgment or choice.'" *Merando*, 517 F.3d at 164 (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). If it does, the second question is

17

"'whether that judgment is of the kind that the discretionary function exception was designed to shield.'" *Id.* (quoting *Gaubert*, 499 U.S. at 322-23).

Unconstitutional conduct by government actors is not entitled to the protection of the discretionary function exception: "[B]ecause government officials never have discretion to violate the Constitution, unconstitutional government conduct is per se outside the discretionary function exception." *Xi*, 68 F.4th at 839 (footnote omitted). "At the motion-to-dismiss stage, all a plaintiff must do to negate the discretionary function exception is plausibly allege a constitutional violation." *Id.* at 840.

In applying the due care exception, the Court asks (1) "whether the statute or regulation in question specifically pr[e]scribes a course of action for an officer to follow," and (2) "if a specific action is mandated, [the court] inquire[s] as to whether the officer exercised due care in following the dictates of that statute or regulation. If due care was exercised, sovereign immunity has not been waived." *B.Y.C.C. v. United States*, 2023 WL 5237147, at *6 (D.N.J. Aug. 15, 2023) (Shipp, J.) (quoting *Welch v. United States*, 409 F.3d 646, 652 (4th Cir. 2005) (alterations in original)); *see also C.D.A. v. United States*, 2023 WL 2666064, at *15 (E.D. Pa. Mar. 28, 2023) (same).

## IV.    Discussion

### A. Exhaustion

Before suing the United States for money damages under the FTCA, a claimant must "present[] the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency . . . ." 28 U.S.C. § 2675(a). If the agency does not finally dispose of a claim within six months, that failure to act, at the option of the claim, can be deemed a final denial of the claim. *Id.* The administrative presentment requirement is part of the "terms

defining the United States' consent to be sued," and as such is jurisdictional. *White-Squire v. USPS*, 592 F.3d 453, 457 (3d Cir. 2010); *see also Freeman v. Lincalis*, 158 F.4th 166, 177 n.42 (3d Cir. 2025) (finding it unnecessary to revisit whether requirement is jurisdictional because "dismissal [for lack of jurisdiction] was in any event unwarranted").

An administrative claim satisfies § 2675(a) "if the claimant (1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim." *Roma v. United States*, 344 F.3d 352, 362-63 (3d Cir. 2003) (quoting *Tucker v. USPS*, 676 F.2d 954, 959 (3d Cir. 1982)). "This is not a high bar." *Freeman*, 158 F.4th at 177. "[A] plaintiff need only provide 'minimal notice' which is 'sufficient to enable the agency to investigate' their claim," a standard that can be met even if the administrative claim specifies no cause of action or an incorrect one, "lacks sufficient facts to prevail at trial," or lacks sufficient information to permit settlement. *Id.* (cleaned up). *Accord Roma*, 344 F.3d at 362 (claimant "need not propound every possible theory of liability in order to satisfy section 2675(a)") (quoting *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1011-12 (7th Cir. 1991)). In the background are § 2675's animating purposes: first, to ease court congestion and expedite possible settlements, and second, to more fairly treat claimants in litigation with their government. *Tucker*, 676 F.2d at 958-59.

On the other hand, a claimant cannot "present one claim to the agency and then maintain suit on the basis of a different set of facts." *Roma*, 344 F.3d at 362 (quoting *Deloria*, 927 F.2d at 1011-12). In *Roma*, a firefighter whose administrative claim asserted negligent instructions to him during a fire could not, in his ensuing lawsuit, also bring a claim for negligence in defendants' failure to prevent the fire. *Id.* at 363. In *Daniels v. United States*, 2025 WL 3284465, at *4 (E.D. Pa. Nov. 25, 2025), an administrative claim of negligence *during* foot

19

surgery did not exhaust claims about whether the surgery should have happened at all. The latter allegations would involve different facts and a different standard of care and the plaintiff had not put the government on notice to investigate them. *Id.* at* 4-5. In its briefing and at oral argument, the government relied on *Maher v. United States*, 2025 WL 2463253 (D.N.J. Aug. 27, 2025) (Bumb, J.), and *Floyd v. United States*, 2024 WL 3064671 (D.N.J. June 20, 2024) (Bumb, J.), both conditions of confinement cases that narrowed partially unexhausted FTCA claims. In *Floyd*, the plaintiff had exhausted claims related to aspects of prison officials' handling of COVID-19, not, *inter alia*, claims about facilities maintenance, inmate transfers, medical care, overcrowding, or toilet availability. 2024 WL 3064671, at *4-6. In *Maher*, plaintiff had exhausted claims of inadequate medical handling of a specific condition and mold exposure, but not retaliatory appointment cancellations or solitary confinement. 2025 WL 2463253, at *5.

These cases indicate that where a plaintiff's lawsuit presents claims that would have required a different, broader investigation than what was disclosed in the administrative claim, the exhaustion requirement is not met. *Roma*, 344 F.3d at 363.

*Muhammad v. United States*, 884 F. Supp. 2d 306, 311 (E.D. Pa. 2012), came to the opposite conclusion on exhaustion where plaintiff submitted an administrative claim based on a warrantless search of his home and his subsequent federal complaint added more factual allegations stemming from the same search. The lawsuit did not assert a "new and distinct theory" requiring a "broader investigation than that originally required by the administrative claim," as all of the causes of action "arose from the same set of facts, having to do with the federal agents' unlawful entry, search, and detention." *Id.* As such, the governmental agency had "minimal notice and an opportunity to investigate" the same set of allegations that formed the basis of the ensuing lawsuit. *Id.*

20

Here, the government asserts that selected factual allegations underlying the negligence claim, as well as the loss of consortium claim *in toto*, were absent from plaintiffs' March 2020 administrative claim set forth in the Gibson Dunn letter.  That asserted a forcible, prolonged separation of a very young, medically fragile child from his father who was detained elsewhere and eventually deported, kept in the dark about where his son was sent and whether his medical needs were being attended to; and in spite of being told about the boy's life-threatening heart condition, government officials transported J.J.R.S. to a foster home across the country.  (D.E. 26-1, Curl Decl., Ex. A.)  The notice also alleges that both father and son were "severely traumatized by their separation and detention," which assertedly lasted for seven months, and that both "continue to experience emotional suffering and psychological trauma."  (*Id.*, at page 5, 13 of 13.)  The attachment to the notice alleges and challenges a government policy that aimed to inflict "extraordinary trauma" on parents and children by separating them and "inflict[ing] so much distress" on them that other families would be deterred from seeking entry.  (*Id.* at page 12 of 13.)  Potential witnesses are listed as "multiple employees" of the relevant agencies "who had contact with or reviewed records related to" plaintiffs and "their apprehension, separation, and detention," and the injuries listed included, *inter alia*, "damages from their separation and restrictions on liberty."  (*Id.*, at page 13 of 13.)

This narrative sufficed to put the government on notice to investigate what was done—or not done—to start and maintain a seven-month period separation of a three-year-old child with medical needs from his parent, who remained detained.  The loss of consortium claim does not add new facts or theories; it seeks relief for effects on the parent-child relationship. The negligence claim challenges governmental officials' handling of plaintiffs, who were either helpless or confined, during this period, including the how and why they were detained and the

attention, or lack of attention, to the child's acute medical needs. The factual allegations in this count of the complaint arise from the same events plaintiffs challenged in their administrative claim years earlier.

At oral argument, the government classed part of the negligence claim as reflecting claims for "medical malpractice" and "improper conditions of confinement," which were not included in the administrative claim. (D.E. 70, 2/11/26 Tr. 23:5-9.) Practically speaking, the government suggested, adding such claims would expand the nature and scope of discovery needed in this case. (*Id.* at 29:14-18.) Plaintiffs stated flatly they are not alleging a medical malpractice stand-alone claim; instead, they challenge "a number of different ways in which the Government negligently or intentionally hurt these plaintiffs." (*Id.* at 54:8-15.) The government knew the full scope of what to investigate, plaintiffs argued, based on what was disclosed in the administrative claim, including how J.J.R.S. was being treated. (*Id.* at 52:3-55:12.)

Considering the government's arguments that its officials properly dealt with D.R.M. and J.J.R.S. every step along the way, arguing here they were not on notice that plaintiffs were raising claims about what they were doing to them every step along the way rings hollow. Having closely reviewed plaintiffs' administrative claim and with the benefit of oral argument, the Court concludes that plaintiffs' claims are fully exhausted.

### B. FTCA Exceptions

In its briefs the government contended that how plaintiffs were treated was a function of intersecting statutes, some of which incorporated discretionary choices available to officials and at least one mandating certain steps, and so the discretionary function exception and due care exception shield their actions. The "policy," which the government described as one that "required the criminal prosecution of all persons who crossed the United States border between

22

points of entry," had no role in what happened to plaintiffs: D.R.M. and J.J.R.S. arrived at a point of entry, not between points of entry, and arrived before the policy began. (D.E. 26, Moving Br. 1-2.)

At oral argument, the government fleshed this out. When plaintiffs arrived, they were statutorily subject to mandatory detention. A separate statute that would permit humanitarian release is discretionary and not implicated here. (D.E. 70, 2/11/26 Tr. 16:7-14.) In tension with mandatory detention was the *Flores* agreement, under which as a minor, J.J.R.S. could only be securely detained for several days. In turn this meant either sending father and son to family detention or separating them. Family detention was not chosen because of capacity limits. This set J.J.R.S on the foster care route through a transfer into ORR custody. (*Id.* at 16:15-17:13.) This was a sequence of statute-driven choices, not a policy promulgated later, or in different geographical areas. (*Id.* at 18:6-18.) And because the decisions immigration officials made in their encounters with D.R.M. and J.J.R.S. were discretionary (or with respect to the ORR transfer, required by statute), those officials can claim the benefit of the discretionary function and due care exceptions. (*Id.* at 18:2-5, 36:21-24.)

This carefully crafted justification for an otherwise shocking series of events overlooks what plaintiffs have actually pleaded. They haven't alleged a "policy" begun in April 2018 (after their arrival) that directed prosecution of arriving persons seeking admission and the cascading statutory effects of that. Plaintiffs are saying that beginning in 2017, the government phased in a policy that sought to maximize trauma inflicted on arriving families by taking children away from parents and exposing family members to intolerable conditions, as a way to effectively deter other families from entering the United States. All potentially applicable statutes and programs were marshaled into the direction of separating families and inflicting harm. (*See*

23

Compl. ¶¶ 27-28 (2017 statement about family separation as deterrent, and memo about criminally enforcing immigration offenses); ¶¶ 30-32 (2017 termination of program allowing family asylum seekers to remain in community and pilot of El Paso separation program); ¶¶ 34-35 (2017 DOJ/DHS memo supported coverage of separations as deterrent); ¶¶ 36-38, 53(c) (actual increase in separations around time of memo and El Paso program); ¶ 42 (alleging that separation policy was underway by the time at the place plaintiffs arrived); ¶¶ 43-45, 50-51 (alleging continuation and formalization of policy); ¶ 53 (alleging that government was aware of risk of harm dating back to 2016); ¶¶ 73-78 (government resisting reunification of families); ¶¶ 57-64 (families subject to inhumane, unsafe conditions, and forced to witness other families being separated); ¶¶ 151-52 (J.J.R.S. not released to his parents, despite their presence, until after his heart surgery).)

Plaintiffs further allege that they were part of the class certified in an action that challenged the policy, and that that action resulted in their reunification.  (*Id.*¶¶ 80, 141.)[6]  As such, the statutory scheme that the government offers as a basis for dismissal was designed for a predetermined, unconstitutional outcome that, whether viewed as a restraint on officers' discretion or as a standalone set of actions, renders the FTCA exceptions inapplicable.  (*See* D.E. 70, 2/11/26 Tr. 9:21-24, 10:12-16 ("[T]he policy was in place and families were being separated pursuant to it prior to [the April 2018 AG] memo. But setting aside the policy, the conduct itself was separately unconstitutional. . . .[B]ecause the discretionary function exception cannot allow

---

[6] The named plaintiffs in that action arrived at a port of entry in November 2017 (that is, like plaintiffs here, before the policy formally came into being).  *Ms. L. v. USCIS*, 302 F. Supp. 3d 1149, 1154 (S.D. Cal. June 6, 2018).

the Government officials the discretion to violate the Constitution, the Government's arguments for the discretionary function exception cannot apply.").)[7]

Although the government mounted a factual challenge to jurisdiction, it hasn't shown that the policy plaintiffs alleged did not exist or did not apply to them, nor has it offered proof that what plaintiffs experienced didn't happen. The Harris Declaration describes CBP's response to plaintiffs immediately upon their arrival. (D.E. 26-3, Harris Decl. ¶ 3-13.) The attached Form I-213s are consistent with plaintiffs' allegations in this lawsuit: they presented themselves to immigration officials immediately and claimed asylum, and when D.R.M. was told that his son would be separated from him, he disclosed J.J.R.S.'s heart condition. (*Id.*, Ex. A, B.) They were denied family detention placement: "Detention placement for family unit has been denied by ICE/ERO- Male head of household." (*Id.*, Ex. A.) D.R.M. was put in expedited removal proceedings, and J.J.R.S. was turned over to ORR.[8] On the specific subject of the policy, Harris

---

[7] Myriad other courts confronted with similar facts have rejected the government's step-by-step approach in favor of looking at what plaintiffs are actually pleading. As one district court cogently put it:

> According to the Government, the discretionary function exception applies to the Government's decision to prosecute [parent plaintiff], its decision to label [child plaintiff] "unaccompanied" under the TVPRA and decisions relating to Plaintiffs' detention. . . . In framing the discretionary decisions in this way, the Government attempts to splice its zero-tolerance policy into a series of discrete, noncontroversial decisions. But this litigation did not arise from an isolated decision to refer [parent] for prosecution nor from an isolated decision to label [child] an "unaccompanied alien child." Instead, the relevant actions arose from the zero-tolerance policy in which the Government used family separation to deter migration to the United States.

*Leticia v. United States*, 2023 WL 7110953, at *11 (E.D.N.Y. Oct. 27, 2023). Here, the government similarly offers a stepwise analysis; the Court rejects it in this context, as it did for purposes of the government's arguments on exhaustion.

[8] The form states that the latter step was taken because D.R.M. had been previously removed. (*Id.*, Ex. A.) By this point, however, family detention had already been denied, making separation inevitable. Similarly, at oral argument, when the government was asked about the

---

attested that he was "aware that Plaintiffs claim in this lawsuit that their separation occurred as a result of the 'pilot program' for the Zero Tolerance Policy." (D.E. 26-3, Harris Decl. ¶ 14.)  The "pilot program" was run by a separate agency or office from that which runs the Hidalgo port of entry, where plaintiffs arrived.  (*Id.* ¶ 15.)  As plaintiffs have not limited their allegations to the "pilot program" in El Paso, Harris has not supplied a basis to conclude that the policy, as plaintiffs allege it, failed to apply to them.  For similar reasons, the Court is unpersuaded by the government's suggestion that because there is no evidence that D.R.M. was deemed amenable for prosecution under 8 U.S.C. § 1325 (a centerpiece of the "Zero Tolerance Policy" as the *government* describes it), plaintiffs must not have been subject to it.  (D.E. 26, Moving Br. 26-27.)  Again, plaintiffs have alleged a policy that was broader in scope, temporally and geographically, than the "Zero Tolerance Policy" described in the April 2018 AG memo.

The government also offers the Park Declaration, which speaks in relevant part to how family detention centers operated in the timeframe of plaintiffs' arrival. (D.E. 26-2, Park Decl. ¶¶ 3-17.)  According to Park, as of March 2018 the only center that could have accommodated J.J.R.S. together with D.R.M., as a male head of household, was Berks FRC in Pennsylvania. That facility "was limited to 96 residents" and was "often at maximum capacity and had no available bed spaces to accept male head-of-household family units." (*Id.* ¶ 14.)  Park does not, however, say that Berks was actually at capacity and unable to accept plaintiffs.

At oral argument, the government conceded that it had not specifically alleged that Berks was full and was unaware of the population in March 2018.  It nonetheless clung to the argument that limited capacity "is a factor that significantly informs the decision on whether or not to

role of D.R.M.'s prior deportation, it pointed to other statutes and the *Flores* agreement for why D.R.M. was designated expedited removal and separated from J.J.R.S. (D.E. 70, 2/11/26 Tr. 14:16-21, 15:15-17:13.)

26

detain . . . [T]he fact that bed space was so limited certainly informs the judgment on whether to transfer to that facility." (D.E. 70, Tr. 62:7-16.)

These statements—that, in the abstract, Berks was often full, and that capacity limitations can inform decisions on placement—don't touch what plaintiffs assert. Supported by statements by officials and witnesses and their own experiences, plaintiffs are suing on the basis of a policy in place at the time J.J.R.S. was forcibly taken from his father that compelled the government officials tasked with handling arriving migrants to choose the option that dictated maximum trauma, including separating families. Meaning this: when the government employees had the option to either detain under 8 U.S.C. § 1225(b) or grant parole under 8 U.S.C. § 1182(d)(5)(A), they would always choose the former. When they had the option to detain families together as a unit or to separate them, they would always choose separation, regardless of capacity.

For purposes of withstanding this Rule 12(b)(1) motion, plaintiffs have adequately pleaded the existence and promulgation of the policy they allege. *See CNA*, 535 F.3d at 145 (on Rule 12(b)(1) motions where jurisdiction is intertwined with merits, less proof is required of plaintiff that would be necessary at trial).

Having identified the specific conduct plaintiffs are challenging, *S.R.P.*, 767 F.3d at 332, the discretionary function exception next asks "whether the act giving rise to the alleged injury and thus the suit involves an 'element of judgment or choice.'" *Merando*, 517 F.3d at 164 (quoting *Gaubert*, 499 U.S. at 322). The "judgment or choice" requirement is not met if a "federal statute, regulation, or policy **specifically prescribes** a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." *Id.* (emphasis added) (quoting *Gaubert*, 499 U.S. at 322) (internal quotation marks omitted)). *See also Clark v. Sec'y, U.S. Navy*, 102 F.4th 658, 661 (3d Cir. 2024) ("If a law, regulation, or policy

27

leaves the agent no meaningful choice, the exception does not apply." (citing *Xi*, 68 F.4th 824 at 837-38). Plaintiffs have sufficiently alleged, at this stage in the litigation, that the family separation policy specifically dictated their separation and related harms. The inquiry need not go further: at this first step, the government has failed to establish the applicability of the discretionary function exception. *Accord B.Y.C.C.*, 2023 WL 5237147, at \*6; *C.D.A.*, 2023 WL 2666064, at \*14.

There is a second reason why this exception does not apply, and it does not depend on crediting plaintiffs' allegations about the existence and parameters of the family separation policy. As noted earlier, the government cannot claim the benefit of the discretionary function exception for conduct that is unconstitutional, because government officials "never have discretion to violate the constitution." *Xi*, 68 F.4th at 839 (footnote omitted). This theory holds whether there was a policy or not, as plaintiffs clarified at oral argument. (D.E. 70, 2/11/26 Tr. 9:23-24 ("But setting aside the policy, the conduct itself was separately unconstitutional."); *id.* at 51:4-8 ("[T]here's no need to ask whether the policy existed. I think plaintiffs are agnostic. . . . [B]oth are strong arguments and both readily dispose of the discretionary function exception that defendant makes.").) Plaintiffs have plausibly alleged unconstitutional conduct by government officials who detained and separated them,[9] including a violation of procedural due process. They have alleged that D.R.M. was separated from his child, depriving him of his interest in care and custody of that child, without notice or a meaningful opportunity to challenge it, and without

---

[9] To be clear, plaintiffs' affirmative claims are tort claims brought under state law; they do not purport to bring constitutional tort claims. (*Cf.* D.E. 26, Moving Br. 34.) Their arguments about unconstitutionality are made in response to the government's invocation of exceptions to the FTCA. *See B.Y.C.C.*, 2023 WL 5237147, at \*8 (rejecting argument that plaintiffs had pleaded impermissible constitutional torts; government was conflating causes of action and immunities from causes of action).

any articulated reason, such as dangerousness or unfitness, other than the government's own interest in using punitive measures as an immigration deterrent. *Leticia*, 2023 WL 7110953, at *11-13 (declining to apply discretionary function analysis due to pleading of procedural due process violation). That sequence, which the government does not factually challenge at this stage, and the exceedingly traumatic way in which it was allegedly effectuated (including keeping D.R.M. uninformed about his medically vulnerable son's whereabouts or access to treatment, intolerable confinement conditions, and failure to track), also accords with the case law finding a substantive due process claim for violation of family integrity to have been plausibly pleaded. *See, e.g.*, *Leticia*, 2023 WL 7110953, at *13-14; *K.O. by & through E.O. v. United States*, 651 F. Supp. 3d 331, 346-47 (D. Mass. 2023) (collecting cases); *A.I.I.L. v. Sessions*, 2022 WL 992543, at *3-4 (D. Ariz. Mar. 31, 2022).

At oral argument, plaintiffs pointed out that this was not the only avenue open to the government, which "could have paroled them into the country," or "detained them together," or "deported them together. But what [the government] didn't have authority to do was separate them, for seven months, and deport the father without the son." (D.E. 70, 2/11/26 Tr. 45:11-15.) Instead of the first three options, which plaintiffs described as constitutionally permissible, the government chose the last one. (*Id.* at 45:19-23.) Plaintiffs' plausible allegations that this violated their constitutional due process rights preempts applying the discretionary function exception at this stage.

The government also invokes the due care exception ("DCE"), but only as to J.J.R.S.'s transfer to ORR after he was designated an unaccompanied child. First, that exception applies to statutes and regulations, not policies. *K.O.*, 651 F. Supp. 3d at 343. Moreover, by the time of this stage in the process, this "decision" was made inevitable by how the alleged policy dictated

29

the preceding events.  As the *K.O.* court put it, the logic is faulty: children whose families were covered by the policy had already been separated from their parents

> before the TVPRA became relevant. The TVPRA might mandate a transfer to ORR after that initial separation, but the government cannot hide behind the DCE when it triggers a statutory scheme with conduct not mandated by the statute. Furthermore, nothing in the TVPRA forbids communication or the relay of accurate *344 information about a parent's whereabouts to a child. Therefore, the DCE does not apply to the alleged conduct.

*Id.* at 343-44.

### C.  Pleading of the Claims

The government also argues that plaintiffs have failed to state a cognizable claim on each of their tort claims.  As noted earlier, the requirement that a plaintiff plausibly plead an underlying state law claim is jurisdictional because it is a condition of the government's immunity waiver under the FTCA.  *Brownback*, 592 U.S. at 217-18.

The parties disagree on the applicable law, with the government arguing that only Texas law applies and plaintiffs countering that Texas, New York, or both states' law applies.  In large part, the relevant law is the same in both states.  But even if there may be a conflict such that a claim would not survive under one of the state's laws, the Court follows the lead of other district courts in this circuit presiding over similar cases involving alleged tortious conduct that stretched over multiple states and an extended period of time, and concludes that if a claim, as pleaded, would suffice under either Texas or New York law, it may proceed past the pleadings stage, subject to further briefing on the choice of law issue on a properly developed factual record. *C.D.A.*, 2023 WL 2666064, at *21 & n.27; *B.Y.C.C.*, 2023 WL 5237147, at *9.

#### 1.  Intentional Infliction of Emotional Distress

The government first challenges this claim as an impermissible systemic tort.  The FTCA allows suit against the government for injury "caused by the negligent or wrongful act or

30

omission of *any employee of the Government while acting within the scope of his office or employment,* under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b) (emphasis added).

This language does not waive immunity for actions of the government as a whole; thus, "systemic" or "institutional" torts are not cognizable under the FTCA.  *B.Y.C.C.*, 2023 WL 5237147, at *8 ("The FTCA limits suits against the Government to those based on the conduct of government employees. . . . [P]laintiffs may not assert 'systemic' claims against the Government writ large." (quoting *E.S.M. v. United States*, 2022 WL 11729644, at *2 (D. Ariz. Oct. 20, 2022)).  Plaintiffs' intentional infliction of emotional distress, or IIED, claim is not such an institutional tort.  The complaint does allege that the policy as a whole was designed to inflict distress on families, but it also alleges that individual employees took steps "through their implementation of the Policy" that were "extreme and outrageous" and "caused Plaintiffs severe emotional distress."  (Compl. ¶¶ 168-70.)

Acts by specific, albeit as-yet unnamed, officials included confiscating and discarding J.J.R.S.'s heart medication over his father's protests about the child's heart condition (*id.* ¶¶ 101, 104, 107, 113); locking plaintiffs in a *hielera* and withholding adequate food, water, and warmth (*id.* ¶¶ 108-10); forcibly waking a sleeping J.J.R.S. at dawn and pulling him from his father's arms (*id.* ¶¶ 115-17); and telling J.J.R.S.'s mother that he'd been found "alone" and would be put up for adoption when arrangements had been made for foster care (*id.* ¶¶ 124-26).  Similar allegations have been held to avoid the systemic tort bar.  *See, e.g.*, *J.P. v. United States*, 679 F.Supp.3d 911, 922 (D. Ariz. 2023).  Construed as a tort claim challenging the conduct of

31

specific officials carrying out or otherwise implementing the policy,[10] this claim may proceed if the required elements are adequately alleged.

Under Texas law, "[t]his tort has four elements: (1) the defendant acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused the plaintiff emotional distress; and (4) the emotional distress was severe." *Hersh v. Tatum*, 526 S.W.3d 462, 468 (Tex. 2017). "Extreme and outrageous" means "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006)). The actions of individual officers described *supra* (discarding and withholding needed medicine for a sick child, placing the child and his parent in intolerable conditions, ripping the sleeping child from his father and separating them without notice of where parent or child was being sent, and whether the young child's medical needs would be addressed) reflect intentional, inhumane conduct, all for the objective of imposing trauma as a means of deterrence. Plaintiffs have plausibly alleged their resulting severe emotional distress, which has, particularly for J.J.R.S., has imposed ongoing suffering. *See Leticia*, 2023 WL 7110953, at *21 (preserving IIED claim in similar scenario); *B.Y.C.C.*, 2023 WL 5237147, at *10 (same).

The government contends that this claim cannot proceed because plaintiffs have not adequately pleaded the role of the policy in driving their separation, and because the officers were simply following the stepwise statutory scheme the government described in arguing for

---

[10] So construed, the government's "paradox" argument does not hold water. The policy's overarching directives do not stand in tension with the specific acts allegedly carried out by individual officers. As plaintiffs said at oral argument, this would "conflat[e] . . . plaintiffs' claims . . . for the specific conduct that individual officers did, with our response to defendant's invocation of the discretionary function exception." (D.E. 70, 2/11/26 Tr. 39:9-12.)

32

application of the discretionary function exception.  (D.E. 26, Moving Br. 36-37.)  The Court rejected the government's unduly narrow view of both the policy and the relevant statutes for the reasons discussed earlier; for the same reasons, these arguments do not render the IIED claim insufficiently pleaded.

### 2. Negligence

Negligence claims under Texas law require "(1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach."  *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022).

Plaintiffs have cited duties imposed by CBP's own policies on the treatment of detainees and the handling of medication, the *Flores* requirements, and the duty imposed by Texas law when the government assumed custody of D.R.M. and J.J.R.S.[11]  These are cognizable duties. *See, e.g.*, *B.Y.C.C.*, 2023 WL 5237147, at *12; *M.A.N.H. v. United States*, 2023 WL 12258657, at *19-20 (C.D. Cal. Sept. 22, 2023); *A.F.P. v. United States*, 2022 WL 2704570, at *10 (E.D. Cal. July 12, 2022) (citing *Salazar v. Collins*, 255 S.W.3d 191, 198 (Tex. App. 2008)).  Plaintiffs have alleged that immigration officials breached these duties when, *inter alia*, they threw out J.J.R.S.'s medicine and didn't get him the prompt treatment he needed; when they kept J.J.R.S. in intolerable conditions especially for a child with his medical condition; when they sent J.J.R.S. to a far-off foster home without telling his father where he was going and without telling the foster home that J.J.R.S. had a heart condition and needed medication; and when they kept the plaintiffs apart for an extended period without contact.  The complaint alleges that these alleged breaches caused harm to plaintiffs, particularly to J.J.R.S.

---

[11] Contrary to the government's arguments, they are not relying on a "duty on law enforcement to refrain from enforcing federal immigration law, or to house children with parents who are lawfully detained under these circumstances." (D.E. 64, Reply Br. 21-22.)

33

The government argues that Texas law requires physical injury as an element of negligence. However, it also allows for a narrow category of mental anguish damages where such damages "(1) . . . are the foreseeable result of a breach of duty arising from some special relationship, or (2) they involve injuries of such a shocking and disturbing nature that mental anguish is a highly foreseeable result." *B.Y.C.C.*, 2023 WL 5237147, at *13 (quoting *Fitzpatrick v. Copeland*, 80 S.W.3d 297, 303 (Tex. App. 2002) (internal quotation marks omitted)). The custodial relationship the government assumed over plaintiffs when it detained, and then separated, them made it foreseeable that, as has been alleged, depriving a medically vulnerable child of both his medicine and his father, and withholding critical information necessary for proper medical care from the persons the government assigned as his caregivers for nearly seven months, would result in mental anguish on both sides of that parent-child relationship. This claim may proceed.

### 3. Loss of Consortium

The complaint pleads this claim on behalf of both plaintiffs. Plaintiffs' opposition brief focuses on a parent's loss of consortium claim for injuries to the child under New York law. (D.E. 39, Opp. Br. 34-35.) At oral argument, plaintiff argued that the loss of consortium claim was viable under both Texas and New York law as to both plaintiffs. (D.E. 70, 2/11/26 Tr. 57:12-58:14.)

Texas law only recognizes a child's cause of action for loss of consortium with respect to the parent where the parent is physically injured. *Reagan v. Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990) ("In order to successfully maintain a claim for loss of parental consortium resulting from injury to the parent-child relationship, the plaintiff must show that the defendant physically injured the child's parent in a manner that would subject the defendant to liability."); *Rodriguez*

34

*v. H.E. Butt Grocery Co., L.P.*, 2021 WL 4597106, at \*3 (Tex. App. Oct. 7, 2021) ("Texas does not recognize claims for parental loss of consortium based on purely emotional harm.").  D.R.M. has not brought a claim or made allegations that he was physically injured, so J.J.R.S. does not have a cause of action under Texas law for loss of consortium.  Texas has not recognized a loss of consortium claim in the other direction for non-fatal injuries, *see Roberts v. Williamson*, 111 S.W.3d 113, 120 (Tex. 2003); *Martinez v. Rojo*, 2020 WL 2542612, at \*3 (N.D. Tex. May 19, 2020), so D.R.M. likewise does not have a claim with respect to J.J.R.S. under Texas law.

Under New York law, "parents generally cannot recover for loss of consortium for their children."  *S.M. v. Madura*, 203 N.Y.S.3d 286, 288 (1st Dept. 2024) (citing *Devito v. Opatich*, 627 N.Y.S.2d 441, 442 (2d Dept. 1995)).  "Although a parent may recover for loss of a child's services upon submitting proof that the child contributed to household income or paid a part of household expenses," *id.* at 288, or if there is proof of the parent's actual expenses connected with the child's injuries, *Samela v. Post Rd. Entm't Corp.*, 954 N.Y.S.2d 603, 606 (2d Dept. 2012); *George v. Windham*, 94 N.Y.S.3d 363, 366 (2d Dept. 2019) ("parent may recover damages measured by the pecuniary loss sustained by the injuries to the child, including the value of the child's services, if any, of which the parent was deprived and reasonable expenses necessarily incurred in an effort to restore the child to health"), dismissal is appropriate if the complaint does not so allege.  The complaint alleges ongoing harm to J.J.R.S., but not any associated medical or other expenses or pecuniary losses.  D.R.M. thus cannot recover under New York law on this claim.  Nor can J.J.R.S., as the child, recover with respect to D.R.M, *see DeAngelis v. Lutheran Med. Ctr.*, 445 N.Y.S.2d 188, 191 (2d Dept. 1981), which plaintiffs do not in any event dispute.  Count 3, therefore, must be dismissed.

35

### 4. Tortious Interference with Familial Relations

Although Texas does not recognize a cause of action for "tortious interference with familial relationships," *see B.Y.C.C.*, 2023 WL 5237147, at \*14, plaintiffs' briefing argued their claim as one for common law child abduction; that is, that a parent may recover from one who, "with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody." (D.E. 39, Opp. Br. 35 (quoting *Silcott v. Oglesby*, 721 S.W.2d 290, 292 (Tex. 1986)).) Plaintiffs have pleaded that the government knew that J.J.R.S. was D.R.M.'s son and did not consent to the separation of child from parent; J.J.R.S. was forced away from D.R.M. Moreover, plaintiffs have challenged the legality of that separation, as extensively detailed earlier in this opinion.

The government argues that plaintiffs cannot show D.R.M.'s legal entitlement to custody of J.J.R.S. when the separation occurred because that separation happened after D.R.M.'s status was changed under applicable statutes. (D.E. 26, Moving Br. 43.)[12] Again here, the government is sidestepping the full scope of the policy and how plaintiffs alleged it drove all subsequent decisions, and again here, the Court rejects that argument at the dismissal stage. This claim may proceed.

### 5. Privilege Defense

Finally, the government argues that it may invoke state law privileges as a defense to liability, and that Texas law would allow it a privilege for conduct authorized by federal law.

---

[12] The government also argues that *Silcott* applied the recognition of this cause of action to cases tried before September 1, 1983. (D.E. 64, Reply Br. 25.) That misses important context, namely that the *Silcott* court expected a new statute effective thereafter to step in as the cause of action. 721 S.W.2d at 293. That statute has since been repealed, and at this juncture, and the parties offering case law to the contrary, the Court predicts that Texas would continue to recognize the common law tort. *K.O.*, 651 F. Supp. 3d at 349 & n.7; *see also D.A. v. United States*, 663 F. Sipp. 3d 715, 737 (W.D. Tex. 2023) (stating that Texas courts recognize this cause of action).

36

(D.E. 26, Moving Br. 43-45; D.E. 64, Reply Br. 18-20.)  As the government recognizes, however, this is an affirmative defense under Texas law.  (D.E. 64, Reply Br. 26 (citing *Gonzales v. United States*, 2025 WL 2429043, at \*3 (S.D. Tex. Mar. 31, 2025).)  A defendant raising an affirmative defense as a basis for dismissal at the Rule 12(b)(6) stage may only prevail on that ground if the defense is "apparent on the face of the complaint and documents relied on in the complaint."  *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131 (3d Cir. 2018) (cleaned up).

That the government acted lawfully (the basis for its privilege argument) is not apparent on the face of the complaint, nor would it be even if the scope is expanded to include the factual proof it offered in support of its Rule 12(b)(1) motion.  To the contrary, as extensively discussed earlier, plaintiffs have plausibly pleaded that the policy governing officials' treatment of plaintiffs violated their due process rights under the U.S. Constitution, and have offered a version of events that is not rebutted at this stage by the government's stepwise statutory argument, the same one that underpins the privilege-as-a-defense argument.  Accordingly, this privilege argument is premature, and must await appropriate factual development.[13]

## V.      Conclusion

For the reasons set forth above, the motion to dismiss is denied with the exception of the claim for loss of consortium, which is dismissed.  An appropriate order will issue.

*s/ Katharine S. Hayden*

Date: March 31, 2026                                    Hon. Katharine S. Hayden, U.S.D.J.

---

[13] The Court therefore need not reach the parties' dispute over whether the privilege defense is available to the government in the first instance.